**In re VALLEY FORGE PLAZA ASSOCIATES (A Pennsylvania Limited Partnership), Debtor.**

**VALLEY FORGE PLAZA ASSOCIATES and Official Committee of Unsecured Creditors, Plaintiffs,**

v.

**The ROSEN AGENCY, INC. and Wendy Rosen, Defendants.**

Bankruptcy No. 89–11136S.
Adv. No. 89–0700S.

United States Bankruptcy Court, E.D. Pennsylvania.

May 11, 1990.

Gary D. Bressler, Mark J. Packel, Adelman Lavine Gold & Levin, Philadelphia, Pa., for debtor/plaintiff.

Stuart Brown, Robert Eyre, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for plaintiff/Committee of Unsecured Creditors.

Virginia Miller, Steven Roth, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for The Rosen Agency, Inc. and Wendy Rosen/defendants.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION/PROCEDURAL HISTORY

The instant adversary proceeding was initiated by a Complaint filed by the Plain-

tiff, VALLEY FORGE PLAZA ASSOCI-
ATES (A Pennsylvania Limited Partner-
ship) ("the Debtor"), against THE ROSEN
AGENCY, INC. ("the Agency") and the
Agency's President, WENDY ROSEN
("Rosen") the Agency and Rosen are collec-
tively referred to as "the Defendants"),
alleging breach of contract, defamation, in-
terference with business contracts, dispar-
agement, and communication of fraudulent
misrepresentations.

On December 22, 1989, the Defendants
filed a Motion for Partial Summary Judg-
ment seeking to strike Counts II and VI of
the Complaint. By Order and Memoran-
dum dated January 17, 1990, the Motion
was denied and a trial date was set for
February 14, 1990.

Count II requests damages for the De-
fendants' breach of the parties' Lease
Agreement and Rider and Multiple Proper-
ty Booking Report, all dated on or about
October 2, 1986. Contrary to the Defen-
dants' assertions in their Motion, we con-
cluded, without deciding whether the Lease
was ambiguous, that the interpretation of
the Lease posited by the Debtor was more
likely to be found to be legally correct than
that offered by the Defendants, and we
refused to strike Count II of the Complaint.

Count VI asserts a claim against the
Defendants for "failure to communicate in-
formation accurately." The Defendants ar-
gued that there is no cause of action under
state or federal law for negligent or fraud-
ulent misrepresentation of facts and that,
even if there were, the Debtor did not rely
upon any alleged misrepresentations of the
Defendants. Finding that Count VI could
state a claim for either defamation or inter-
ference with existing or future contractual
performance, we refused to strike Count
VI.

After a careful review of the testimony
from the trial held on February 14 and 15,
1990, relevant documents, and case law, we
conclude that the Defendants are liable to
the Debtor for the full $290,718.55 in dam-
ages claimed; $7,345.97 in unpaid charges

from the 1989 Event; $3,000.00 in punitive
damages; and attorneys' fees and costs as
provided for in paragraph 24J of the Lease.
Our verdict, however, is a conditional one
and the Defendants may mitigate these
damages by committing themselves, on or
before July 2, 1990, to hold, in good faith,
either their 1991, 1992 or 1993 crafts show
at the Debtor's facilities *and* paying the
Debtor only $45,360.00 in liquidated dam-
ages for the cancellation of the 1990 Event
instead of $290,718.55, as well as the other
elements of damages awarded.

## B. RELEVANT FACTS

The Debtor is a Pennsylvania limited
partnership that owns a wholly-integrated
complex consisting of, among other things,
the Valley Forge Convention and Exhibit
Center, a convention center ("the Center"),
two luxury hotels, the Radisson and the
Sheraton ("the Hotels"), restaurants, enter-
tainment facilities, and an office building
(the entire complex is collectively referred
to as "the Facilities"). The Debtor filed a
voluntary petition under Chapter 11 of the
Bankruptcy Code on March 28, 1989. A
detailed history of the main bankruptcy
case is contained in our earlier Opinion, *In
re Valley Forge Plaza Associates,* 109 B.R.
669, 671–74 (Bankr.E.D.Pa.1990).

J. Leon Altemose ("Altemose") is the
President of First Avenue Realty Corp., the
general partner of the Debtor, and is also a
limited partner of the Debtor. Louis Paul
("Paul") is the Treasurer of First Avenue
Realty Corp. and a limited partner of the
Debtor.[1]

The Agency is a corporation engaged in
the business of producing trade shows and
meetings for American crafts artists. Ro-
sen is President as well as a stockholder
and director of the Agency.

In early 1986, Rosen toured the Facilities
with Altemose to explore the possibility of
holding the Agency's annual craft show
("an Event") at the Facilities. Each Event
features the goods of approximately 800
exhibitors and draws thousands of atten-

---

1. On May 1, 1990, Messrs. Leon Altemose and
Paul, and Leon's cousin and partner, Roger D.
Altemose, have also filed individual voluntary

Chapter 11 petitions, docketed as Bankr. Nos.
90–21031T, 90–21032T, and 90–21033T, respec-
tively.

dees who purchase these goods at wholesale prices to sell to the public. Rosen was obviously impressed with the Facilities because the Agency held its first Event at the Facilities just a few weeks later in February, 1986.

On or about October 2, 1986, the Debtor and the Agency executed a long term Lease Agreement and Rider ("the Lease"). Pursuant to the Lease, the Agency agreed to lease the Center for the purpose of presenting the Event over the course of the next twenty (20) years. The annual rental payment was set at $75,600.00 for the first year and increased each year thereafter based upon the consumer price index.

Testimony established that the rental payments required by the Lease for the Center were very favorable to the Defendants. The Debtor offered the Defendants such favorable terms because of the Defendants' representation that the Event would generate substantial business for the Debtor's main sources of income: the Hotels, restaurants, and other entities at the Facilities other than the Center.

As is discussed in detail at pages 898–99 *infra*, the Lease contained several provisions pursuant to which the Agency could terminate either a single Event or the Lease in its entirety. The interpretation of these provisions is the key to the resolution of the breach of contract claims asserted by the Plaintiffs.

After or about the same time, the Debtor and the Agency, by Commerce Travel, acting on behalf of the Agency, executed a Multiple Property Booking Report ("the Booking Report"). Pursuant to the Booking Report, certain large blocks of rooms were reserved at the Debtor's Hotels for each Event's exhibitors and attendees.

The Agency held Events at the Facilities in 1986, 1987, 1988, and 1989. Each Event featured approximately 800 exhibitors and their work and drew more than 3,000 attendees to the Facilities.

The Agency does not dispute that the exhibitors and attendees used all of the Debtor's Facilities, not merely the Center. The Agency itself sponsored and/or participated in parties, functions, and meetings at the Facilities. Exhibitors often rented space at the Facilities to hold meetings with their customers. In fact, the Event, due to its size, required virtually all of the Debtor's resources to accommodate it, and the Debtor was unable to book other space at the Center during the time that an Event was taking place there.

The bulk of the Debtor's revenue from the Events is through the sale of food, beverages and entertainment, and the rental of rooms at the Hotels to the exhibitors and attendees. Based upon the Debtor's experience from the 1987–89 Events, the Booking Reports are accurate estimates of the rooms rented in connection with each Event.

The Debtor filed its Chapter 11 bankruptcy petition in this court on March 28, 1989. Following the Debtor's bankruptcy filing, neither Rosen nor the Agency contacted the Debtor to determine the status of the bankruptcy case or to inquire how the filing would affect the Debtor's ability, if at all, to comply with the Lease.

On or about May 2, 1989, a Motion of Debtor Authorizing Assumption of Executory Contracts with the Rosen Agency, Inc. pursuant to Bankruptcy Code § 365(a), 11 U.S.C. § 365(a), was filed with this court. After the withdrawal of certain objections raised by the Agency, we found, by Order dated June 7, 1989, that the Lease and Booking Report were executory contracts which could be, and thereby were, assumed by the Debtor.

Some time in early spring of 1989, but before May 11, 1989, Rosen prepared and mailed a letter and "Exhibitor Survey" ("the Survey") to approximately 800 of the Event's exhibitors. Rosen prepared the letter and the Survey after consultation with her personal "board of advisors," which included several attorneys. The letter contained numerous incorrect statements regarding the Debtor's bankruptcy case, its impact on the Events, and the Debtor's ability to perform under the Lease. *See* pages 904–05 *infra*. Rosen admits that the letter and survey were "slanted" and contained nothing positive

about the Debtor. Seventy-six (76%) percent of the approximately 500 responding exhibitors expressed a desire not to return to the Facilities.

On or about May 11, 1989, Rosen telephoned Paul and requested, or, more accurately, demanded, to be released from the Lease. Rosen claimed that she could hold the Events more profitably at larger facilities in Atlantic City and, therefore, wanted to be released from any obligations under the Lease. When Paul did not agree to so release Rosen, she became upset and threatened to damage the Debtor's business and reputation. Rosen also threatened to contact the press and belittle the Debtor and to bring the press to any court proceedings should the Debtor litigate this matter.[2] By letter dated May 18, 1989, the Agency, through Rosen, notified the Debtor, in a single communication, that it decided not only not to conduct the 1990 Event at the Facilities, but also to cancel the Lease and the Booking Report.

In the survey to the exhibitors; the May 11, 1989, phone call to Paul; and the May 18, 1989, letter to Paul terminating the Lease and cancelling the 1990 Event, Rosen stated the reason for wanting to cancel the Lease was that the Events required larger facilities and could be held more profitably at such facilities in Atlantic City. The Defendants, in fact, held the 1990 Event in Atlantic City.

The Defendants belatedly realized the legal weaknesses of their articulated reasons for wishing to terminate the Lease, and, at the hearing, attempted to contend that there were other reasons for the Defendants' action. Accordingly, the Defendants called several employees who related incidents of guests without room reservations, a missing shower cap, a lost night gown, a "life-threatening" bus ride through the Debtor's parking lot, stained carpets, a loud public address system, problems with employees of the Facilities, and other woes encountered during the 1989 Event.

We find this attempt by the Defendants to rationalize their breach of the Lease as a justifiable response to these incidents of poor service to be transparent. The problems recited may very well have existed, but we have no doubt that they were not the reason the Defendants cancelled the Lease. The Defendants' employees admitted that, when the above problems were brought to the Debtor's attention, they were dealt with in a proper manner.

Moreover, many of the problems which the Defendants claimed to have with the Facilities' personnel were actually problems with individuals who were not employees of the Debtor but were rather, independent contractors *retained by the Defendants,* such as security personnel and bus drivers. The Defendants' employees also admitted that they did not report many of the problems they encountered to the Debtor's representatives either during the 1989 Event or afterwards at any of the "wrap-up meetings" with the Debtor's representatives. It is reasonable to assume that, if problems were not serious enough to report, they were not serious enough to cause the Defendants to terminate the Lease. Further, one of the Defendants' employees, who was the on-site manager of the 1989 Event, testified that she opposed terminating the Agency's Lease with the Debtor and sent a note to one of the Debtor's representatives thanking her for a "perfect" stay at one of the Hotels in 1989.

In summary, we find the Defendants' attempts to proffer valid reasons for breaching the Lease to be belated, disingenuous and wholly incredible, and indicia of self-awareness of the inadequacy of legitimate grounds for terminating the Lease.

The Debtor, despite its best efforts, was able to mitigate its damages from the loss of the Agency as a tenant to only a limited extent by rebooking a small portion of the Facilities. The Debtor's employees credibly testified that the Debtor's net loss due to the cancellation of the 1990 Event was $290,718.55. The Debtor also requests attorneys' fees and costs, to vindicate its rights, as permitted by the Lease; damages in the amount of $7,345.97, which

---

2. To our knowledge, the trial of this proceeding was not covered by the press.

represent alleged unpaid charges from the 1989 Event, and punitive damages.

## C. DISCUSSION

1. SINCE THE PARTIES HAVE CONSENTED TO OUR DECIDING IT, AND THIS PROCEEDING INVOLVES POST–PETITION CONDUCT OF THE DEFENDANTS, WE CAN PROCEED TO DETERMINE IT.

■ Counsel for both parties expressly consented to our entering a final order in this proceeding, allowing us to do so irrespective of whether this proceeding is core or non-core. 28 U.S.C. § 157(c)(2). Moreover, this proceeding alleged wrongful actions of the Defendants which all occurred post-petition. Consequently, this proceeding appears to be core, pursuant to 28 U.S.C. § 157(b)(2)(A). *See In re Ben Cooper, Inc.,* 896 F.2d 1394, 1397–1400 (2d Cir.1990); *In re Arnold Print Works, Inc.,* 815 F.2d 165, 168–71 (1st Cir.1987); *Valley Forge Plaza Associates v. Fireman's Fund Ins. Cos.,* 107 B.R. 514, 516–18 (E.D. Pa.1989); and *In re Jackson,* 90 B.R. 126, 129–30 (Bankr.E.D.Pa.1988).

Therefore, we may and shall proceed to determine it.

2. THE LEASE PROVISIONS REGARDING LIQUIDATED DAMAGES FOR THE CANCELLATION OF AN EVENT AND TERMINATION OF THE LEASE ARE AMBIGUOUS.

The key to the resolution of the Debtor's breach of contract action against the Defendants is the interpretation of the Lease as it was executed. In rendering this interpretation, we will compare the key paragraphs in their final form with their form in earlier drafts of the Lease.

The pertinent paragraphs for us to consider are paragraphs 25 of the Lease and 44A of a Rider to the Lease. Paragraph 25 provides as follows:

25. LIQUIDATED DAMAGES: If PROMOTER cancels any EVENT covered by this LEASE AGREEMENT, PROMOTER agrees to pay the CENTER the following amounts as liquidated damages and not as a penalty, and the parties agree that such amounts constitute the reasonable provision for the damages, which are otherwise difficult to calculate, sustained by the CENTER in the event of cancellation by PROMOTER due to the difficulty in obtaining a replacement EVENT:

A. If PROMOTER cancels more than one year before the first day of the LEASE PERIOD, the CENTER shall retain the first down payment under Paragraph 5.A.

B. If PROMOTER cancels more than six months, but less than one year before the first day of the LEASE PERIOD, the CENTER shall retain the first two payments under Paragraph 5.A.

C. If PROMOTER cancels less than six months before the first day of the LEASE PERIOD, the center shall retain all amounts paid to it by PROMOTER and the balance of all rent due under Paragraph 5 of this LEASE AGREEMENT shall be immediately due and payable.

The Rider adds the following language to paragraph 25:

To 25. Any sums due pursuant to Paragraph 25 of the LEASE AGREEMENT shall be reduced dollar for dollar by any amount obtained by the CENTER in reletting the LEASED PREMISES during the time period scheduled for the EVENT, less any and all costs, expenses and damages incurred by the CENTER as a result of PROMOTER'S cancellation of the LEASE AGREEMENT.

Paragraph 44A, added to the Lease by the Rider, provides, in pertinent part, as follows:

Beginning with the EVENT scheduled in 1988 and thereafter, the CENTER or PROMOTER may terminate the LEASE AGREEMENT and this RIDER by notifying the other in writing a minimum of twelve months before the Commencement Date of the next scheduled EVENT.

The Agency argues that its May 18, 1989, letter to Paul effectively cancelled the 1990 Event. Rosen admits that the Agency is liable to the Debtor for liquidated damages in the amount of $45,360.00 in accordance with paragraph 25 of the Lease for this cancellation of the 1990 Event. However, the Defendants further claim that, because the Agency terminated the Lease twelve months prior to the commencement date for the 1991 Event, its termination of the Lease is valid under paragraph 44A of the Lease, and, therefore, it is not liable for any other damages to the Debtor in connection with the termination of the Lease.

The Debtor interprets paragraph 44A to mean that the Event falling within the twelve-month period after the notice must be held at the Facilities irrespective of the termination of the Lease. As a result, it argues that the Defendants are liable to it for all consequential damages to the Facilities caused by the Defendants' refusal to conduct the 1990 Event at the Center.

Paragraph 44A was the result of active negotiations between the Agency and the Debtor. The first draft of paragraph 44A stated, in pertinent part, as follows:

> Unless the PROMOTER otherwise notifies the CENTER in writing no later than twelve months prior to the commencement of the next scheduled EVENT, this LEASE AGREEMENT shall automatically renew from year to year for the EVENT dates set forth below.

This language was revised in the final version to make the right to terminate mutual, and by replacing the phrase "no later than twelve months" with "a minimum of twelve months" to clarify that at least twelve months' notice was required in order to effect a valid termination of the Lease under paragraph 44A. The final form of paragraph 44A also removed language characterizing the Lease as a "year to year" agreement.

The addition to paragraph 25 contained in the Rider also went through a revisionary process before reaching its final form. The first draft of the addition to paragraph 25 stated as follows:

> Provided, however, that any sums due pursuant to this Paragraph 25 shall be reduced dollar for dollar by any amount obtained by the CENTER in reletting the LEASED PREMISES during the time period scheduled for the EVENT.

The final version of the addition to paragraph 25 is the same as the first draft plus the following clause added to the end: "less any and all costs, expenses and damages incurred by the CENTER as a result of the PROMOTER'S cancellation of the LEASE AGREEMENT."

When confronted with a dispute involving the interpretation of a contract, such as the Lease, the court's duty is to determine the parties' intent. *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1131 (3d Cir.1969). *See also Bainville v. Hess Oil V.I. Corp.*, 837 F.2d 128, 130 (3d Cir.1988) (discussing indemnity clauses); *Pennzoil Co. v. Federal Energy Regulatory Com.*, 645 F.2d 360, 388 (5th Cir.1981), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir.1980) (quoting *O'Farrell v. Steel City Piping Co.*, 266 Pa.Super. 219, 229, 403 A.2d 1319, 1324 (1979) (" 'In construing a contract, a court's paramount consideration is the intent of the parties.' ")); and *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 483 F.Supp. 1185, 1196 (E.D.Pa.), *aff'd*, 637 F.2d 205 (3d Cir. 1980). The court must attempt to determine the parties' intent at the time the contract was executed, not their intent at the time of the dispute. *See Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 363 (3d Cir.1987); and *In re Spagnol Enterprises, Inc.*, 81 B.R. 337, 352 (W.D.Pa.1987).

The rules of contract construction binding upon this court were succinctly stated by the Third Circuit in *Ludwig*, 405 F.2d at 1131, as follows:

> It is generally stated that the fundamental or paramount question in the legal construction of all contracts is a determination of the real intention of the parties. Williston, Interpretation and Construction of Contracts, Ch. 22, § 601; 17A C.J.S. Contracts § 295. A contract must

be construed as a whole and whenever possible, effect will be given to all parts. Williston, Ch. 22, § 619; 17A C.J.S. Contracts § 297 (footnote omitted). A construction which renders performance of a contract possible will be adopted, rather than one which renders its performance impossible or meaningless, unless the latter construction is absolutely necessary. 17A C.J.S. Contracts § 318 (footnote omitted). Where ambiguity exists, the minor provisions must be construed as not to conflict with the main purpose of the contract. Williston, Ch. 22, § 619.

■ A court should always pick a reasonable interpretation of a contract over an unreasonable one, *Tookmanian v. Safe Harbor Water Power Corp.*, 505 F.Supp. 920, 922–23 (E.D.Pa.1981), and attempt to interpret ambiguous provisions to be consistent with the contract as a whole and to effect the purpose of the entire contract. *See Press Machinery Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781, 784–85 (8th Cir.1984); *In re Community Medical Center*, 623 F.2d 864, 866 (3d Cir.1980); and *Shipping Corp. of India, Ltd. v. Sun Oil Co.*, 569 F.Supp. 1248, 1254 (E.D.Pa.1983).

■ Recognizing that, with respect to contract interpretation, it would be helpful if judges were psychics who could delve into the parties' minds to ascertain their subjective intent, but realizing that they are not, the Third Circuit articulated the following procedure to be utilized when interpreting contracts:

> [I]n order to interpret contracts with some consistency, and in order to provide contracting parties with a legal framework which provides a measure of predictability, the courts must eschew the ideal of ascertaining the parties' subjective intent and instead bind parties by the objective manifestations of their intent.

*Mellon Bank*, 619 F.2d at 1009. The strongest indicia of the parties' intent are the words of the contract. *See In re St. Mary Hospital*, 101 B.R. 451, 460–61 (Bankr.E.D.Pa.1989) (unambiguous contract interpreted to mean what it says even if the parties might have believed that it says something different).

Courts should not interprete the terms of a written contract in a manner that would conflict with the unambiguous language of the contract. *Mellon Bank*, 619 F.2d at 1009 (citing *National Cash Register Co. v. Modern Transfer Co., Inc.*, 224 Pa.Super. 138, 142, 302 A.2d 486, 488 (1973)). *See also East Crossroads Center, Inc. v. Mellon–Stuart Co.*, 416 Pa. 229, 230, 205 A.2d 865, 866 (1965) ("When a written contract is clear and unequivocal, its meaning must be determined by its contents alone"); and *Best v. Realty Management Corp.*, 174 Pa.Super. 326, 329–30, 101 A.2d 438, 440 (1953) ("A court is not authorized to construe a contract in such a way as to modify the plain meaning of its words, under the guise of interpretation.").

While the written words of the contract are the most important consideration, we are also mindful of the statement of the Court in *Mellon Bank*, 619 F.2d at 1010, that

> English is often a difficult and elusive language, and certainly not uniform among all who use it. External indicia of the parties' intent other than written words are useful, and probably indispensable in interpreting contract terms.

Rather than determining whether the Lease is ambiguous solely from the four corners of the pages, the parties approach was, properly, to provide testimony from the parties who negotiated and drafted the Lease and therefrom to "determine if there is objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible to differing meanings." *Id.* at 1011. *See also Richmaid Kitchens, Inc. v. Pennsylvania Lumbermens Mutual Ins. Co.*, 641 F.Supp. 297, 307 (E.D.Pa.1986), *aff'd*, 833 F.2d 307 (3d Cir.1987) (courts are not bound by the four corners of the document). We must determine as a matter of fact whether the terms of the Lease are ambiguous. *See In re Reading Co.*, 76 B.R. 386, 389 (E.D.Pa. 1987); *Richmaid Kitchens*, 641 F.Supp. at 307; and *St. Mary, supra*, 101 B.R. at 461.

"Ambiguous" is defined as "[s]usceptible to multiple interpretation." W. Morris, The American Heritage Dictionary 41 (1976). The pertinent case law has adopted a similar definition of "ambiguous," defining an ambiguous contract as one reasonably susceptible of different constructions or interpretations. *See Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1360 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 865, 102 L.Ed.2d 989 (1989); *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3d Cir.1986); *Papago Tribal Utility Authority v. Federal Energy Regulatory Commission*, 723 F.2d 950, 955 (D.C.Cir.1983); *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381 (5th Cir.1981); and *Reading Co., supra,* 76 B.R. at 389.

We conclude that the interplay of paragraphs 25 and 44A is ambiguous. Based upon a review of the entire Lease and testimony of the parties, however, a consistent meaning of these paragraphs can be obtained.

3. BASED UPON A REVIEW OF THE LEASE IN ITS ENTIRETY AND THE PERTINENT TESTIMONY, WE CONCLUDE THAT THE DEFENDANTS FAILED TO VALIDLY TERMINATE THE LEASE PURSUANT TO ITS TERMS AND, THEREFORE, HAVE BREACHED THE LEASE.

■ Paragraph 44A, in its final form as quoted at page 898 *supra,* is ambiguous in that it is not clear whether the "next scheduled EVENT" must be held during the twelve-month notice period. We conclude that it must be. While paragraph 44A would have been clearer if the words "must be held" had been added after "the next scheduled EVENT," we are obliged to work with what we have. A reasonable interpretation of the phrase "the next scheduled EVENT" would be that these words refer to the next EVENT scheduled to be held. It would be unreasonable to conclude that they refer to the next Event, which, while scheduled, has itself been cancelled.

The testimony at trial established that, in the original draft of paragraph 44A, the right to terminate the Lease embodied therein belonged solely to the Agency. In the negotiation process, the Debtor obtained this right for itself as well. Further, both parties agreed that twelve months was an adequate length of time for each to make other arrangements upon the other's termination of the Lease. To conclude that the Event scheduled during those twelve months need not be held would negate any value of the twelve months' notice period.

The Defendants appear to be arguing that they would be able to evade the effect of paragraph 44 by first cancelling the 1990 Event, and then terminating the entire Lease, effective 1991. There are three reasons why this argument is unpersuasive. Firstly, as the Creditors' Committee, an intervening plaintiff, argues, paragraph 25 does not appear to be applicable to the circumstances under which the 1990 Event was simply *moved* from the Center to Atlantic City rather than *cancelled.* Secondly, Rosen purported to both cancel the 1990 Event and terminate the Lease in the same letter. This made it perfectly clear that the cancellation of the 1990 Event was just one aspect of a complete cancellation of the Lease. Thirdly, even were the Defendants' attempt to avoid liability for violating the twelve months' notice requirement not so obvious as when the cancellation of an Event and termination of the Lease are collapsed in a single letter, it does not appear that any attempt to frustrate the twelve months' requirement should be tolerated.

Paragraph 25 is the liquidated damages provision of the Lease. The language of paragraph 25, without the added language from the Rider, clearly provides that liquidated damages are to be paid upon the cancellation of a single Event. The Rider, however, adds that the liquidated damages will be reduced by the amount obtained by the Debtor in reletting the Convention Center "less any and all costs, expenses and damages incurred by the CENTER as a result of PROMOTER'S cancellation of the *LEASE AGREEMENT*" (emphasis added).

Until the appearance of the last two words added by the Rider, paragraph 25 addresses only of the cancellation of a single Event. The reference to the cancellation of the Lease renders the mitigation of the liquidated damages portion of paragraph 25 ambiguous.

In light of our conclusion that paragraph 44A requires the performance of one final Event during the twelve-month notice period for termination of the Lease in all circumstances, it is clear that the liquidated damages contemplated by paragraph 25 only apply to the cancellation of a single Event, not to the termination of the Lease. The Lease provides a procedure for its own termination without liability. It would therefore not make sense to conclude that paragraph 25 was intended to provide for the payment of liquidated damages upon termination of the Lease. Their reference to the cancellation of the Lease in the last sentence of paragraph 25 therefore appears to us to be simply an error of the draftspersons which is not, in itself, sufficient to undo the obvious meaning of paragraph 44A of the Rider. To find otherwise would be to ignore the Lease, the twelve-month notice requirement in paragraph 44A, and the Lease's purpose as a whole.

4. THE DEBTOR IS ENTITLED TO REASONABLY FORESEEABLE DAMAGES IN THE AMOUNT OF $290,718.55 FROM THE DEFENDANTS FOR THEIR BREACH OF THE LEASE.

The Debtor requests damages in the amount of $290,718.55 from the Defendants for their breach of the Lease. The Debtor derived this figure from a review of the profits it realized from the past Events, and Paul testified that it represents a conservative amount for the losses the Debtor suffered from the cancellation of the Lease. This figure includes, however, not only the losses suffered by the Debtor from the loss of rents of the Center, but also losses suffered by the Facilities as a whole, including the Hotels, restaurants, and all other facilities of the complex.

The Defendants claim that they are not liable for any damages representing losses from an entity at the facilities other than the Center because such damages were not reasonably foreseeable at the time the Lease was executed. The applicable law of Pennsylvania clearly provides that

"[w]here a contract is breached without legal justification, the injured party is entitled to recover ... whatever damages he suffered, provided (1) they were such as would naturally and ordinarily follow from the breach; (2) they were reasonably foreseeable and within the the contemplation of the parties at the time they made the contract; (3) they can be proved with reasonable certainty." *In re American Spinning Mills, Inc.*, 43 B.R. 365, 367 (Bankr.E.D.Pa.1984) (quoting *Keystone Diesel Engine Co., Inc. v. Irwin*, 411 Pa. 222, 224, 191 A.2d 376 (1963)).

*Accord In re 222 Liberty Associates*, 101 B.R. 856, 863 (Bankr.E.D.Pa.1989).

The Facilities constitute an integrated complex. All of the various entities are under one roof and owned and operated by the Debtor.

Nevertheless, the Defendants argue that they were unaware that the Debtor owned the Hotels, restaurants, and other entities at the Facilities in addition to the Center. In the Survey, however, the Defendants identified the Debtor as follows:

Valley Forge Plaza Associates owns and operates the Sheraton, Radisson, the Plaza office complex as well as the Valley Forge Convention & Exhibit Center.

It must be remembered that the Defendants made this statement *prior to* the May 11, 1989, phone call to Paul demanding to be released from the Lease and the May 18, 1989, letter to Paul breaching the Lease. The Defendants, therefore, knew of the common ownership and operation of the Facilities prior to their breach of the Lease.

The key to determining whether damages are reasonably foreseeable is, however, determining whether the consequences which occurred were reasonably foreseeable *at the time of making the*

*contract.* Although the Defendants claim that the damages requested by the Debtor were not reasonably foreseeable at the time of the Lease was executed, we find that they were for several reasons. Rosen first toured the Facilities with Altemose in early 1986, and inspected not merely the Center, but the Hotels, restaurants, and other entities at the complex. At that time and at the time the Lease was executed, Rosen stressed to the Debtor that the Events would bring substantial business to the Facilities as a whole, including the Hotels, restaurants, and other entities. The Defendants clearly knew that the Center was a "loss leader," and that the Debtor realized its profit from these entities, not from the rental of the Center itself.

The Defendants also dealt with the same individuals for the Facilities as they did for the Center. We have no doubt that the Defendants were or should have been aware of the common ownership and operation of the Facilities.

Whether or not the Defendants were aware of the common ownership and operation of the Facilities is not dispositive of this issue. We conclude that the Defendants, at the time the Lease was executed, were aware that the cancellation of the Lease would result in damages, to entities related to the Center, far exceeding the damages for losses from the renting of the Convention Center. The Defendants are experienced in their business and knew, and even stressed, at the time the Lease was executed that the Debtor stood to gain profit for the Facilities as a whole from the Events. The Defendants clearly knew at the time the Lease was executed that the Debtor would suffer a loss from the Facilities as a whole if the Lease was cancelled.[3]

The damages requested by the Debtor are therefore clearly of the type that would naturally and ordinarily follow the Defendants' breach of the Lease. The Debtor is therefore not claiming any unusual or unsuspected damages as the result of the Defendants' breach of the Lease.

Having concluded that the type of damages requested by the Debtor were reasonably foreseeable, were of the type that would naturally follow the breach of the Lease, and, as stated earlier, were the result of, or proximately caused by, the Defendants' actions, we now must determine if the Debtor has established its damages with a reasonable degree of certainty. We find that it has.

As noted in *American Spinning Mills,* 43 B.R. at 367,

"Compensation for breach of contract cannot be justly refused because proof of the exact amount of loss is not produced ... [T]he law does require ... that the evidence shall with a fair degree of probability establish a basis for the assessment of damages." *Exton Drive–In, Inc. v. Home Indemnity Co.,* 436 Pa. 480, 488, 261 A.2d 319 (1969), *cert. denied,* 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46. "All that is required is such reasonable certainty that damages may not be based merely upon speculation and conjecture[.] *Macan v. Scandinavia Belting Co.,* 264 Pa. 384, 393, 107 A. 750 (1919).

*See also In re Repco Products Corp.,* 100 B.R. 184, 198 (Bankr.E.D.Pa.), *aff'd,* C.A. No. 89–5514 (E.D.Pa. Sept. 8, 1989).

The Debtor arrived at its request for damages by reviewing historical data from the previous Events and then deducting the amount it realized from a partial reletting of the Facilities during the time reserved for the 1990 Event. We are satisfied that the Debtor has established its damages with a reasonable certainty. *See In re Chapman,* 77 B.R. 1, 6 (Bankr.E.D.Pa. 1987). Further, the Defendants have not objected to any of the specifics of the Debtor's calculations. We, therefore, award the Debtor, at least conditionally, $290,718.55 in damages for the breach of the Lease, plus attorneys' fees and costs.

The Defendants argue that the only contracts relating to the Hotels are the Book-

---

**3.** As a result, if the Center were not commonly owned, the Defendants would probably have assumed that consideration passed from the owners of the other Facilities to the owners of the Center in exchange for the benefits flowing to the other Facilities as a result of the Center's business. Under this scenario, the Center's loss of this consideration upon the Defendants' termination of the Lease would have been a foreseeable additional loss to the Center.

ing Reports and that they are not liable for breach of the Booking Reports because the Booking Reports are not binding contracts between the Debtor and them. The Defendants quote our language from an earlier decision in another proceeding involving the Debtor, *In re Valley Forge Plaza Associates, Valley Forge Plaza Associates, v. Schwarz,* Bankr. No. 89–11136S, Adv. No. 89–0495S (Bankr.E.D.Pa. October 2, 1989), *aff'd,* 114 B.R. 60 (E.D.Pa.1990), in which we stated that

> Multiple Property Booking Reports ... [do] not create any obligation upon the Defendant not to cancel the event in issue greater than seventy-two (72) hours before it was to commence.

In *Schwarz,* however, we merely held that a Booking Report created no independent basis for liability where no separate lease existed. Here, a separate Lease exists; the Lease creates the obligation upon the Defendants to hold the Events at the Facilities; and the loss of revenues from the Hotels was foreseeable from the date the Lease was executed irrespective of the existence of the Booking Reports. Further, we previously determined that the Booking Reports were executory contracts which the Debtor could, and did, assume.

Our decision here regarding damages for breach of the Lease is not based upon whether or not the Booking Reports are contracts. It is based upon our determination that the Debtor breached the Lease. The damages are awarded because they were reasonably foreseeable consequences of a breach of the Lease at the time the Lease was executed and were established by the Debtor to a reasonable certainty.

### 5. THE DEFENDANTS' PUBLICATION OF THE SURVEY WAS DEFAMATORY.

■ The Debtor alleges in Count III of its Complaint that Rosen's publication of false statements concerning the Debtor's bankruptcy in the Survey was defamatory. We agree, finding that Rosen's conduct in publishing falsehoods in the Survey was outrageous and, clearly, her intent was to injure the Debtor.[4]

Rosen mailed the Survey to the approximately eight hundred (800) prospective exhibitors at the 1990 Event. We believe that a survey is an objective solicitation and collection of the opinions and views of others. The instant survey does not meet this definition, because it was far from objective.

The Survey contained the following false statements (the reasons for the falsity of which are in parentheses) which, at worst, were intentionally made to defame the Debtor and, at best, were made with reckless disregard and indifference as to their truth and effect on the Debtor:

> The bankruptcy occurred before we [the Defendants] signed the 1990 contract and paid a substantial deposit for the coming year. (In fact the Lease ran for an additional 17 years).

> At any time during the Chapter 11 process the trustee can change/cancel any contract. (There is no trustee because the Debtor has remained a Debtor-in-Possession throughout the case).

> The center might have the right to lay off employees and reduce services as they see fit, regardless of any written agreements. (The bankruptcy filing did not affect the Debtor's contractual obligations).

> If the hall/hotel is not able to pay a bill such as electric, water, etc., support services might be shut down at any moment before or during the event. (The automatic stay provided, if anything, additional protections against utility terminations).

> At any moment the trustee could announce Chapter 7, a complete liq-

---

**4.** The Debtor also claims that certain statements made to the press and other show managers were defamatory. Testimony did not establish, however, that these statements, although made by the Defendants with the same malicious intent as those in the Survey, caused the Debtor to suffer damage to its reputation or pecuniary damages. One show manager was offended by statements made by Rosen during a telephone call, but he also testified that, even in light of them, he intended to continue to hold his show at the Facilities.

uidation/sale of the property. (There was no trustee in this case).

In the portion of the Survey where Rosen asks the exhibitors for their opinions as to whether the Event should continue to be held at the Debtor's Facilities or moved elsewhere, the Survey asked the exhibitors whether they would participate in an Event in Atlantic City, Philadelphia, or at the Facilities. In presenting the alternative of remaining at the Facilities, the Survey posed the following question:

> 5) I would rather [than participating in Atlantic City or Philadelphia] take a risk and do Valley Forge........
> YES_____ NO_____

Rosen admitted, as she had to, that the Survey was "slanted" and included nothing "positive" about the Debtor. Describing the Survey as "slanted" was an understatement. Rosen was clearly attempting to solicit negative responses to the question of whether the Event should return to the Facilities. It is no surprise that seventy-six (76%) percent of the responses that she received were negative to the alternative to "take a risk and do Valley Forge." [5]

Particularly disturbing about the Survey is that Rosen consulted her personal board of advisors, which included at least two attorneys, regarding the accuracy of the contents of the Survey prior to its mailing. Assuming that her advisors gave competent legal advice, which would have had to have been inconsistent with the statements in the Survey, Rosen apparently decided to ignore such advice and give the exhibitors an erroneous interpretation of the facts. Rosen also did not contact the Debtor or its counsel regarding the status/repercussions of the bankruptcy.

Under Pennsylvania law, it is well established that "[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Corabi v. Curtis Publishing Co.,*

441 Pa. 432, 442, 273 A.2d 899, 904 (1971). However, it is further established that

> to be defamatory, it is not necessary that the communication actually cause harm to another's reputation or deter third persons from associating or dealing with him. Its character depends upon its general tendency to have such an effect. In a particular case it may not do either, [1] because the other's reputation is so hopelessly bad or [2] so unassailable that no words can affect it harmfully, or [3] because of the lack of credibility of the defamer.

(citing RESTATEMENT OF TORTS § 559, comment *d* (1938)).

In *Baker v. Lafayette College,* 350 Pa. Super. 68, 76, 504 A.2d 247, 251 (1986), *aff'd,* 516 Pa. 291, 532 A.2d 399 (1987), the court stated that

> [w]hether a publication is capable of defamatory meaning is a question of law for the court to decide. A publication is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or deter third persons from associating and dealing with him. *Specifically, a communication, which "ascribes to another's conduct, character or a condition that would adversely affect its fitness for the proper conduct of his lawful business, trade or profession" is defamatory* (emphasis added).

*See also Gordon v. Lancaster Osteopathic Hosp. Ass'n., Inc.,* 340 Pa.Super. 253, 489 A.2d 1364 (1985); and *Zartman v. Lehigh County Humane Society,* 333 Pa.Super. 245, 482 A.2d 266 (1984).

Whether or not a particular statement or communication has the above described effect is determined by the test enunciated by the *Corabi* court. This issue is further discussed in *Beckman v. Dunn,* 276 Pa.Super. 527, 534, 419 A.2d 583, 586 (1980), where the court states that

> [t]he test is the effect the [statement] is fairly calculated to produce, the impres-

---

5. The Debtor accurately points out in its Trial Brief at 12 n. 7 that even some of the exhibitors thought the Survey was unfair. One exhibitor wrote that the "questions ... are obviously phrased to elicit favorable response to Atlantic City...." That exhibitor concluded that "this doesn't seem a fair and unbiased questionnaire at all...."

sion it would naturally engender, in the minds of the average person among whom it is intended to circulated.

In *Goralski v. Pizzimenti,* 115 Pa. Cmwlth. 210, 214, 540 A.2d 595, 597 (1988), the court noted that the plaintiff's burden of proof in a defamation action in Pennsylvania is set forth in 42 Pa.C.S. § 8343(a). This section provides:

> **Burden of Plaintiff**—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:
>
> (1) The defamatory character of the communication.
>
> (2) Its publication to the plaintiff.
>
> (3) Its application to the plaintiff.
>
> (4) The understanding by the recipient of its defamatory meaning.
>
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
>
> (6) Special harm resulting to the plaintiff from its publication.
>
> (7) Abuse of a conditionally privileged occasion.

*Accord, Dougherty v. Boyertown Times,* 377 Pa.Super. 462, 547 A.2d 778 (1988); and *Frick v. Stevens,* 43 D. & C.2d 6 (Cumberland Co. C.P.1967).

The Debtor satisfies all of the criteria required by 42 Pa.C.S. § 8343(a) to be successful in its defamation action. Criteria (2), (3), and (5) are clearly satisfied and require no further discussion.

The statements in the Survey are defamatory within the standards established by the Pennsylvania Supreme Court in *Corabi, supra.* The Defendant's statements, set forth on page 903 *supra,* certainly had a tendency to harm the reputation of the Debtor by lowering it in the estimation of the community and deterring third parties from associating or dealing with the Debtor, satisfying Criteria (1) and (4).

■ Rosen argues that she did not intend to defame the Debtor, but was merely expressing her opinion of the Debtor's bankruptcy to the Agency's customers. In Pennsylvania, however, both defamatory and intentional conduct can be deduced from circumstantial evidence. *See Agriss v. Roadway Express, Inc.,* 334 Pa.Super. 295, 314, 483 A.2d 456, 465–66 (1984). Further, in *Pierce v. Capital Cities Communications,* 576 F.2d 495, 505 (3d Cir.1978), the Third Circuit stated that

> [i]t is established that courts should not scrutinize simply the literal references of the language in question, but also should weigh the words together with their context.

The circumstances surrounding the Survey clearly evidence the Defendants' intent to defame and injure the Debtor. When he refused to accede to her demand to agree to terminate the Lease, Paul testified, without rebuttal, that Rosen told him that she was going to "bury" the Debtor and speak to journalists and other show managers regarding her "concerns" about the Debtor. Thus, the statements in the Survey appear to be just one aspect of a series of acts intended to defame and injure the Debtor.

The issue of whether a statement in the form of an opinion could be defamatory was considered by the court in *Braig v. Field Communications,* 310 Pa.Super. 569, 456 A.2d 1366 (1983), *cert. denied,* 466 U.S. 970, 104 S.Ct. 2341, 80 L.Ed.2d 816 (1984). There, the court adopted the standard articulated in 3 RESTATEMENT (SECOND) OF TORTS, § 566, at 170 (1977), with regard to defamatory opinions, which provides that

> a defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

The court in *Redco Corp. v. CBS, Inc.,* 758 F.2d 970, 972 (3d Cir.1985), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 107 (1985), stated as follows:

> Although there may be no such thing as a false opinion, an opinion which is unfounded reveals its lack of merit when the opinion-holder disclosed the factual basis for the idea. If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject on

the basis of an independent evaluation of the facts. However, if the opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion.

*See also In re Frymire*, 87 B.R. 856, 860 (Bankr.E.D.Pa.1988) ("All statements, defamatory or otherwise, are, to a certain degree, expressions of opinion of the party making them.")

Rosen's statement in the Survey gave the appearance of being phrased in technical language, which would tend to give the average reader the impression that Rosen had obtained this information from a knowing and authoritative source. Rosen does not explain to the exhibitors the basis for her statements or that they are merely her opinions, encouraging them to evaluate their soundness for themselves.

The Defendants have not established that any privilege existed between them and the exhibitors which insulates them from liability for the defamatory statements. *Reichman v. Bureau of Affirmative Action*, 536 F.Supp. 1149, 1180 (M.D. Pa.1982). An example of such a privilege is found in the *Harbridge v. Greyhound Lines, Inc.*, 294 F.Supp. 1059 (E.D.Pa. 1969), where the credit reports of an agency engaged in the business of reporting financial information to subscribers upon request were determined to be privileged. Under Pennsylvania law, therefore, the plaintiff in the defamation action has the burden of proving that such privilege had been abused. *Id.* at 1063–64.

In their Trial Brief, at 28–29, the Defendants state that

[i]t is widely recognized that communications made on a proper occasion, from a proper motive, in a proper manner, and based upon reasonable cause are privileged and cannot be actionable as defamation. *Baird v. Dun & Bradstreet, Inc.*, 446 Pa. 266, 285 A.2d 166, 171 (1971).... A conditional privilege exists when '(1) some interest of the person who publishes the defamatory matter is involved, (2) some interest of the person to whom the matter is published or some other third person is involved, or (3) a recognized interest of the public is involved.' *Beckman v. Dunn*, 276 Pa.Super. [527] 535, 356, 419 A.2d 583, 588 (1980).

The Defendants claim that because they share a "common business interest" with the exhibitors, their statements in the Survey are privileged and, therefore, cannot be defamatory.

The Defendants have not articulated any "recognized interest of the public" as required under Pennsylvania law for the existence of a conditional privilege. As a matter of law, no such privilege exists. *Baird* refers to communications made, *inter alia*, "from a proper motive, ... and based upon reasonable cause ..." as being privileged. The Defendants' motive was to injure the Debtor. We find that the statements were not based upon reasonable cause, as we have concluded that they were made with malicious intent and without care as to their truth. Since the Defendants have failed to establish any recognizable privilege, no burden shifts to the Debtor and Criterion (7) is inapplicable.

The Debtor has suffered special harm as a result of the defamatory statements in satisfaction of Criterion (6). Rosen testified that she would have remained at the Facilities had the exhibitors expressed a desire through the Survey to do so. She clearly included the defamatory statements in the Survey to obtain a vote to leave the Facilities. According to Rosen's testimony, the results of the purposefully slanted Survey were the main reason that the Defendants broke the Lease and left the Facilities. The negative vote from the Survey was, we find, the result of the defamatory statements. The defamatory statements, therefore, contributed to the damages of $290,718.55 suffered by the Debtor for breach of the Lease.

Testimony established that individual exhibitors, in addition to renting rooms at the Hotels, often rented space at the Facilities to hold meetings of their own with various purchasers and other individuals. Rosen's defamatory statements discouraged the exhibitors from returning to the Facilities and

undoubtedly must have resulted in the loss of this type of rental business by the Debtor.

Therefore, we conclude that the Debtor has satisfied its burdens and should be the prevailing party in the defamation claim.

Proof of any of the following would constitute a successful defense to a defamation action under Pennsylvania law:

(1) The truth of the defamatory communication.

(2) The privileged character of the occasion on which it was published.

(3) The character of the subject matter of defamatory comments is of public concern.

42 Pa. C.S.A. § 8343(b). The Defendants failed to establish any of the three enumerated defenses. Therefore, they have no defenses to the Debtor's claims of defamation.

6. THE DEBTOR FAILED TO QUANTIFY ITS ACTUAL COMPENSATORY DAMAGES DUE TO THE DEFENDANTS' DEFAMATION; THEREFORE, ITS DAMAGES ARE LIMITED TO PUNITIVE DAMAGES OF $1,000.00.

Pennsylvania law limits the award of damages in a defamation action by the terms of 42 Pa.C.S. § 8344, which provides as follows:

In all civil actions for libel, no damages shall be recovered unless it is established to the satisfaction of the jury, under the direction of the court as in other cases, that the publication has been maliciously or negligently made, but where malice or negligence appears such damages may be awarded as the jury shall deem proper.

In the instant matter, we sit as the finder of fact and, determiner of the damages.

■ As stated at page 904, *supra*, we believe that the Defendant's statements were at best reckless and, more probably, intentionally erroneous. We are persuaded by a preponderance of the evidence that the Defendant's conduct did rise to the level of maliciousness. Our conclusion is supported by Pennsylvania law, which presumes malice in defamation actions. The court in *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 271 (3d Cir.1980), concluded that the malice component of a Pennsylvania defamation action is implied or presumed to exist from the unprivileged publication of actionable, defamatory words *per se*. The presumption of malice can be negated by a showing that the statements furthered some important social interest which is entitled to protection at the expense of uncompensated harm to the plaintiff's reputation. *Id*. The Pennsylvania Supreme Court also concluded that, although malice is essential to an action for libel, it may be implied or presumed to exist from the unprivileged publication of actionable defamatory words *per se*. *Corabi, supra*, 441 Pa. at 451–52, 273 A.2d at 909.

The Defendants have not produced any evidence to rebut the presumption of malice implied by Pennsylvania law. We conclude, therefore, that the Defendants' acted maliciously and are liable to the Debtor for compensatory and punitive damages. *See Geyer v. Steinbronn*, 351 Pa.Super. 536, 506 A.2d 901 (1986); and *Sprague v. Walker*, 23 D. & C.3d 638 (Phila.Co.C.P.1982).

■ We will, however, limit the damages awarded to the Debtor for defamation. The Debtor did not quantify its compensatory damages with respect to its defamation action and it is not our place to estimate such damages. We will, therefore, make no award to the Debtor on account of these damages.

■ Nevertheless, we will proceed to award the Debtor $1,000.00 in punitive damages, having concluded that the Defendants' behavior was outrageous and the statements in the Questionnaire were defamatory under Pennsylvania law. Pennsylvania law does not require that punitive damages bear a reasonable relationship to compensatory damages. *Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 103, 555 A.2d 800, 803 (1988). Further, it is not necessary that specific compensatory damages be awarded to sustain a punitive damage award. *Id.*, 521 Pa. at 102, 555 A.2d at 802. *See also, Bemer Aviation, Inc. v.*

*Hughes Helicopter, Inc.,* 621 F.Supp. 290 (E.D.Pa.1985); *Marcone v. Penthouse International, Inc.,* 577 F.Supp. 318 (E.D.Pa. 1983); *In re Tigue,* 82 B.R. 724, 737 n. 3 (Bankr.E.D.Pa.1988); *In re Wagner,* 74 B.R. 898 (Bankr.E.D.Pa.1987); *Feld v. Merriam,* 314 Pa.Super. 414, 461 A.2d 225 (1983); and *Rhoads v. Heberling,* 306 Pa. Super. 35, 451 A.2d 1378 (1982).

In *Laniecki v. Polish Army Veterans Association,* 331 Pa.Super. 413, 417, 480 A.2d 1101, 1103 (1984), the Superior Court affirmed a judgment allowing punitive damages only in a libel suit. The jury awarded only punitive damages because it concluded that the plaintiff's reputation had been reinstated, thereby negating any compensatory damages. The Superior Court concluded that because the plaintiff proved a cause of action for compensatory damages, even though it did not receive a monetary award for them, an award of punitive damages was permissible. *Id.,* 331 Pa.Super. at 427, 480 A.2d at 1108. Even though compensatory damages were not awarded, punitive damages were permissible because a cause of action in defamation was proven.

In *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742 (1984), the Pennsylvania Supreme Court adopted the rule set forth at 4 RESTATEMENT (SECOND) OF TORTS, § 908(2), at 464 (1979), which states as follows:

> (2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

"Noticeably missing from Section 908(2) is any requirement that an award of punitive damages be proportional to compensatory damages." *Kirkbride,* 521 Pa. at 102, 555 A.2d at 803. "If the purpose of punitive damages is to punish a tortfeasor for outrageous conduct and to deter him or others from similar conduct, then a require-

ment of proportionability defeats that purpose." *Id.,* 521 Pa. at 103, 555 A.2d at 803.

We recognize, however, that, at some point, the amount of punitive damages may be so grossly disproportionate to the act and the harm suffered thereby "that it will shock the court's sense of justice." *Id.,* 521 Pa. at 104, 555 A.2d at 803–04. We believe that the punitive damages awarded herein are justified when viewed against the Defendants' actions, which are shocking to this court, and the nature and extent of the harm to the Debtor and the wealth of the Defendants.

We recognize that, under Pennsylvania law, "a breach of contract cannot result in punitive damages even though it may result in compensatory damages." *Kinnel v. Mid–Atlantic Mausoleums, Inc.,* 850 F.2d 958, 968 (3d Cir.1988), and cases cited therein. We do not, however, award punitive damages to the Debtor for the Defendants' breach of the Lease. Punitive damages are awarded to the Debtor on its successful tort claims only.

7. THE DEFENDANTS HAVE TORTIOUSLY INTERFERED WITH THE DEBTOR'S PROSPECTIVE CONTRACTUAL RELATIONS AND ARE LIABLE TO THE DEBTOR FOR PUNITIVE DAMAGES IN THE AMOUNT OF $1,000.00 ON THIS CLAIM.

Pennsylvania recognizes a claim of tortious interference with a contract as actionable, but has divided it into two distinct causes of action: one concerning interference with existing contractual rights, and the other concerning interference with prospective contractual relations. *See U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914 (3d Cir.1990).

The Pennsylvania Supreme Court, in *Adler, Barish, Daniels, Levin & Creskoff v. Epstein,* 482 Pa. 416, 431, 393 A.2d 1175, 1181–82 (1978), *cert. denied,* 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979), adopted the following rule set forth in the 4 RESTATEMENT (SECOND) OF TORTS, § 766, at 7 (1979), with respect to tortious

interference with existing contractual rights:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other from the third person's failure to perform the contract.

As a threshold matter, the plaintiff alleging such a tort must establish that it has a contract right which has been affected adversely by the defendant's conduct. *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 208, 412 A.2d 466, 471 (1979). In addition, the following elements must be established:

(1) a prospective contractual relation;

(2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual damage resulting from the defendant's conduct.

*Id. Accord, Vintage Homes, Inc. v. Levin,* 382 Pa.Super. 146, 155, 554 A.2d 989, 994 (1989).

A "prospective contractual relation" has been defined as "something less than a contractual right, something more than a mere hope." *Thompson Coal,* 488 Pa. at 209, 412 A.2d at 471. A prospective contractual relation requires that there be a "reasonable probability" that contractual relations will be realized. *Id.* (citing *Glenn v. Point Park College,* 441 Pa. 474, 480, 272 A.2d 895, 898–99 (1971)). Such a reasonable probability "may arise from an unenforceable express agreement or an offer." *U.S. Healthcare, supra,* 898 F.2d at 925 (also citing *Glenn, supra,* 441 Pa. at 481 n. 6, 272 A.2d at 899 n. 6). The determination of privilege "is not susceptible of precise definition" but is established by the " 'rules of the game' " and " 'the area of socially acceptable conduct which the law regards as privileged.' " *U.S. Healthcare,* 898 F.2d at 925 (*quoting Glenn,* 441 Pa. at 482, 272 A.2d at 899). While the Pennsyl-

vania Supreme Court has not adopted the Second Restatement test with respect to the tort of interference with prospective contractual relations, the four-point test of *Thompson Coal* remains intact in analyzing this tort. *Silver v. Mendel,* 894 F.2d 598, 601–02 (3d Cir.1990).

We can find no presently existing contractual right between the Debtor and any third party to whom the Defendants published their defamatory statements. The Booking Report is, at best, a contract between the Debtor and the Defendants, not a contract between the Debtor and any third parties. Thus, the Debtor has not met the threshold requirement for tortious interference with existing contractual rights because no actual contract exists between the Debtor and third-parties.

Nevertheless, we find that the Debtor was able to establish that the Defendants tortiously interfered with prospective contractual relations. Experience from the 1986–1989 Events conclusively demonstrates that the Debtor had more than the requisite "reasonable probability" that contractual relations would be realized with exhibitors and attendees for the rental of rooms in the Hotels and Facilities to hold individual meetings separate from the Event.

Our previous conclusion that the Defendants possessed the intent to harm the Debtor is applicable here and we conclude that the Defendants intended to harm the Debtor by impeding contractual relationships between the Debtor and these third parties. As before, we find no privilege between the Defendants and the third parties or other justification which would excuse the actions of the Defendants.

The Debtor's damages as a result of the Defendants' interference with its prospective contractual relations are in the form of lost revenues from these contracts. However, as in the case of its claim for defamation, the Debtor has not specially quantified the amount of these damages. Therefore, we will not award the Debtor any compensatory damages on this cause of action. We will, however, award the Debtor punitive damages in the amount of

$1,000.00 against the Defendants for their tortious interference with the Debtor's prospective contractual relations.

8. THE DEFENDANTS HAVE DISPARAGED THE DEBTOR AND ARE LIABLE TO THE DEBTOR FOR PUNITIVE DAMAGES IN THE AMOUNT OF $1,000.00 ON THIS CLAIM.

██ The tort of disparagement, also known as trade libel, is distinct from defamation. Defamation protects an entity's interest in character or reputation. Disparagement protects an entity's economic interests. *Zerpol Corporation v. DMP Corporation*, 561 F.Supp. 404, 408 (E.D.Pa. 1983).

The Third Circuit recently distinguished defamation and disparagement as follows:

The distinction between actions for defamation and disparagement turns on the harm toward which each is directed. An action for commercial disparagement is meant to compensate the vendor for pecuniary loss suffered because statements attacking the quality of his goods have reduced their marketability, while defamation is meant to protect an entity's interest in character and reputation.

*U.S. Healthcare, supra*, 898 F.2d at 924. Pennsylvania has adopted the standard for disparagement set forth in 3 RESTATEMENT (SECOND) OF TORTS, § 623, at 334 (1977) (hereinafter this volume is cited as "the Restatement"), which provides as follows:

One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if

(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard to its truth or falsity.

Comment *a* to § 623A of the Restatement, *id.* at 335, as the Debtor points out in its Trial Brief, is helpful in explaining the applicability of § 623A to the instant facts:

The general principle stated in this Section is applied chiefly in cases of the disparagement of property in land, chattels, or intangible things or of their quality ... The rule is not, however, limited to them. It is equally applicable to other publications of false statements that do harm to interests of another having pecuniary value and so result in pecuniary loss.

Section § 629 of the Restatement defines a disparaging statement as one which (a) the publisher intends to be understood, or (b) the recipient should reasonably understand as tending, to cast doubt upon the quality of another's land, chattels, or intangible things, or upon their quality. *Id.* at 347–48.

In order to be successful in its action for disparagement, the plaintiff must prove

1) that the disparaging statement of fact is untrue or that the disparaging statement of opinion is incorrect; 2) that no privilege attaches to the statement; and 3) that the plaintiff suffered a direct pecuniary loss as the result of the disparagement.

*U.S. Healthcare*, 898 F.2d at 924. *See also Eagle's Eye, Inc. v. Ambler Fashion Shop, Inc.*, 627 F.Supp. 856, 863 (E.D.Pa.1985); and *Zerpol, supra*, 561 F.Supp. at 409.

██ The Debtor has satisfied the three elements for a successful disparagement action and our discussion of them will be brief. The statements in the Survey highlighted at pages 904–05 *supra* are untrue. If, indeed, the statements are merely opinions, as Rosen argues, they are incorrect. No privilege attaches to the statements. Finally, the Debtor suffered direct pecuniary loss as a result of the disparagement. The statements in the Survey were intended to and did attack the quality of the Debtor's property, the Facilities, and reduce their marketability as evidenced by the responses to the Survey.

For the same reasons articulated at pages 908–09 *supra*, we hold an award

of punitive damages to the Debtor on this claim is also limited to $1,000.00.

9. THE DEBTOR DID NOT RELY UPON THE DEFENDANTS' INACCURATE STATEMENTS REGARDING ITS BANKRUPTCY AND, THEREFORE, CANNOT ESTABLISH THAT THE DEFENDANT· COMMITTED THE TORT OF FAILURE TO COMMUNICATE ACCURATE INFORMATION.

■ The Debtor also seeks to recover damages from the Defendants under a claim that the Defendants failed to communicate accurate information to others regarding the Debtor's bankruptcy. 4 RESTATEMENT (SECOND) OF TORTS, § 531 at 66 (1977), thusly establishes the tort for fraudulent misrepresentation:

§ 531. General Rule

One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

This Restatement section has been adopted in Pennsylvania. *See, e.g., Woodward v. Dietrich,* 378 Pa.Super. 111, 127, 548 A.2d 301, 309 (1988).

However, the Debtor fails in this cause of action because the Debtor was not in the group that the Defendants intended or expected would rely on the statements. The Defendants intended to influence the exhibitors and other promoters not to do business with the Debtor, not influence the Debtor itself.

Only members of the class or group which the Defendants knew or had reason to expect would rely upon the misrepresentations can recover under this theory. The Debtor never relied upon the misrepresentations. Further, the Debtor was not in the class of entities which the Defendants knew or should have expected would rely on the misrepresentations. Therefore, the Debtor has failed to state a claim under this legal theory.

10. THE DEFENDANTS ARE LIABLE TO THE DEBTOR FOR $7,345.97 REPRESENTING UNPAID CHARGES FROM THE 1989 EVENT.

■ The Debtor alleges that the Defendants failed to timely vacate the Convention Center after the 1989 Event and, therefore, are liable to it in the amount of $7,345.97. Certain members of the Defendants' party remained at the Convention Center for one additional day after the 1989 Event. The Debtor sent the Defendants an invoice in the amount of $7,345.97 representing charges for the holdover period. The Defendants have not paid these charges.

The Defendants claim that they are not liable to the Debtor for these charges because the Debtor did not inform the Defendants of the basis for such charges on the bill sent to them for same. They also plead surprise, because the Debtor usually presented them with one final bill for the use of the Center, and the instant bill was dispatched after the remittance of the final bill.

Paragraph 18D of the Lease sets forth an "extended charge" for which the Defendants are liable if they do not timely surrender the Center to the Debtor. Assuming that the Defendants were familiar with the Lease they clearly knew, at the time of the holdover, that they would be liable for additional charges if they failed to timely vacate the Center.

In fact, paragraph 18D provides that the Debtor shall receive

1.5 times an amount equal to the cost of one day's rental ... or $10,000, whichever is higher, for each calendar day or portion of a day after the end of the LEASE PERIOD that [the Defendants] or its exhibitors fail to vacate the [Center].

The Debtor was therefore authorized by the Lease to charge the Defendants a mini-

mum of $10,000.00 for their holdover after the 1989 Event. If the Defendants were surprised, it should be because the Debtor charged them *less* than the amount of their liability under the terms of the Lease.

The Defendants do not dispute that they failed to timely vacate the Center. Even though the Debtor may not have informed the Defendants of the basis for the additional charge at the time it sent the Defendants the invoice therefor, the Defendants are liable for the charges now that the basis is known.

Altemose testified that, because of his good relationship with the Defendants, he did not intend, at first, to charge them for this holdover. As their relationship deteriorated, however, Altemose apparently changed his mind and decided to charge the Defendants as permitted by the Lease. The fact that Altemose "thought" about not charging the Defendants for their holdover does not act as a waiver of his right to do so.

Finally, the Defendants do not dispute the Debtor's calculation of the additional charges. We are therefore convinced that the Defendants are liable to the Debtor in the amount of $7,345.97 as requested.

11. THE DEFENDANTS MAY MITIGATE THE DAMAGES AWARDED BY HOLDING A FUTURE EVENT AT THE FACILITIES.

■ We were dismayed by the hardlined and malicious attitude which the Defendants displayed in attempting to extricate themselves from their commitments to the Debtor. With a dash of prudence and a sprinkling of self-restraint, the Defendants could have avoided this situation. The Defendants should have simply terminated the Lease by their letter of May 18, 1989, and then held the 1990 Event at the Facilities. By doing so, the Defendants would have been released from the Lease free from liability. Now, however, judgment is hereby entered against the Defendants, in the amount of $290,718.55, plus $7,345.97

representing unpaid charges from the 1989 Event, plus punitive damages in the amount of $3,000.00. In addition, paragraph 24J of the Lease provides that

[i]n the event of default or any violation of this LEASE AGREEMENT, PROMOTER agrees to pay the CENTER all reasonable legal fees, costs and expenses incurred as a result of such breach and in collecting or attempting to collect any amounts which the CENTER is entitled to under the LEASE AGREEMENT.

We can conceive of no reason why the Defendants should not be deemed liable for all of the Debtor's reasonable attorneys's fees and costs incurred in prosecuting this action, rather than the Debtor's estate.

Despite our dismay regarding the Defendants' conduct, we nevertheless consider this award of damages of over $300,000 to be a very large sum, especially when it is appreciated that most of it is attributable to the Defendants' misinterpretation of ambiguous contractual provisions. Furthermore, the Defendants, which ironically hinted an intention to file their own bankruptcy case or cases just before trial, may simply lack the financial resources to pay such a large judgment. Therefore, we deem it prudent to permit the Defendants to mitigate these damages by holding, in good faith, either the 1991, 1992 or 1993 Event at the Facilities at the originally-scheduled times, or as close thereto as possible if the Debtor has otherwise committed the Facilities, and on the original terms contemplated by the Agreement. We have previously held that such a conditional verdict is quite appropriate and is often appreciated by all of the parties to a controversy. *See Zintsmaster v. Werner*, 41 F.2d 634, 635 (3d Cir.1930); *222 Liberty, supra*, 101 B.R. at 865; *In re Adams*, 94 B.R. 838, 853–54 (Bankr.E.D.Pa.1989); and *In re Boston Business Machines*, 87 B.R. 867, 873–74 (Bankr.E.D.Pa.1988).

We direct that the Defendants must notify the Debtor and this court in writing by July 2, 1990, of their intention to mitigate their damages and must specify whether it

intends to hold the 1991, 1992 or 1993 Event at the Facilities. In this way, we will know, within two months, of the scope of the Defendants' monetary liability and both parties can begin plans for this final Event well in advance. The failure of the Defendants to satisfy this time requirements will act as a waiver of their right to mitigate the damages imposed hereunder.

We realize that taking advantage of this opportunity to mitigate its damages may be impossible for the Defendants, as it may interfere with other commitments already made by them. However, any condition allowing for mitigation of damages of almost $250,000 is a substantial dispensation to the Defendants. We also decide that, even if the Defendants decide to so mitigate their liability to the Debtor, they must still pay to the Debtor $45,360.00 in liquidated damages for the cancellation of the 1990 Event, $7,345.97 in unpaid charges from the 1989 Event, $3,000.00 in punitive damages, plus the Debtor's attorneys' fees and costs as provided for in paragraph 24J of the Lease.

## D. CONCLUSION

An Order consistent with the Conclusions reached in this Opinion will be entered.

### ORDER

AND NOW, this 11th day of May, 1990, upon consideration of testimony presented at the February 14 and 15, 1990, trial on this matter, the parties' Pre-trial Briefs, and the parties' post-trial Proposed Findings of Fact, Proposed Conclusions of Law, and Briefs, it is ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Plaintiff VALLEY FORGE PLAZA ASSOCIATES ("the Debtor"), and against the Defendants, THE ROSEN AGENCY, INC. and WENDY ROSEN, jointly and severally, in the amount of $290,718.55; $7,345.97 representing unpaid charges from the 1989 Event; punitive damages in the amount of $3,000.00; or a total of $301,964.52, plus the Debtor's attorneys' fees and costs as provided for in paragraph 4 of this Order.

2. The Defendants may mitigate these damages by notifying the Debtor and this court in writing on or before July 2, 1990, of their intent to hold either the 1991, 1992, or 1993 Event at the Facilities.

3. If the Defendants decide to mitigate their damages to the Debtor pursuant to paragraph 2 *supra*, they must then pay to the Debtor only $45,360.00 in liquidated damages for the cancellation of the 1990 Event, $7,345.97 in unpaid charges from the 1989 Event, $3,000.00 in punitive damages, or a total sum of $55,705.97, and attorneys' fees and costs as provided in paragraph 4 of this Order.

4. The parties are urged to attempt to agree upon reasonable attorneys' fees and costs which are due to the Debtor's counsel pursuant to paragraph 24J of the Lease. If this matter is not resolved by that date, the Debtor's counsel may, on or before July 3, 1990, file a Motion requesting such fees, said Motion to be procedurally in conformity with *Meade Lane and Development Co., Inc.*, 527 F.2d 280 (3d Cir.1975); and *In re Mayflower Associates*, 78 B.R. 41 (Bankr.E.D.Pa.1987). However, if the Debtor's counsel has made a reasonable request for such fees which is refused, the said counsel may recover compensation for time spent on the fee application as well.

5. All compensation received by the Debtor's counsel pursuant to paragraph 4 of this Order shall be paid to the Debtor's estate to recompense the estate for fees paid to the Debtor's counsel for services in this proceeding.