**VALLEY FORGE PLAZA ASSOCIATES**
**(A Pennsylvania Limited Partnership)**

v.

**The ROSEN AGENCY, INC.,**

v.

**Wendy ROSEN.**

**Civ. A. No. 90–4125.**

United States District Court,
E.D. Pennsylvania.

Oct. 10, 1990.

Virginia H. Miller, Steven Roth, Penny M. Conly, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for appellants Rosen Agency and Wendy Rosen.

Robert H. Levin, Gary D. Bressler, Robert M. Bovarnick, Adelman, Lavine, Gold & Levin, Philadelphia, Pa., for appellee Valley Forge Plaza Assoc.

Robert B. Eyre, Stuart Brown, Mesirov, Belman, Jaffe, Philadelphia, Pa., for Creditors Committee.

James J. O'Connell, Asst. U.S. Trustee, Office of U.S. Trustee, Philadelphia, Pa.

## MEMORANDUM

NEWCOMER, District Judge.

This case comes as an appeal from a final order of the bankruptcy court. This court has jurisdiction to hear such appeals pursuant to 28 U.S.C. § 158(a). For the reasons stated below, the court shall affirm the decision of the bankruptcy judge in part and reverse it in part.

### I. *Procedural Background.*

Valley Forge is the owner and operator of a convention center and hotel complex. Defendant the Rosen Agency, Inc. ("The Rosen Agency") is in the business of organizing crafts shows around the country. Defendant Wendy Rosen is the President of The Rosen Agency. [2/14/90, 8:16–17][1] On October 2, 1986, the Rosen Agency and the Valley Forge Convention and Exhibit Center ("Convention Center") entered into a Lease Agreement (the "Lease Agreement") and Rider No. 1 to Lease Agreement (the "Rider") pursuant to which the Rosen Agency agreed to lease approximately 143,384 square feet in the Convention Center for the purpose of producing an "Event" in February of 1987. [Exhibit D–1, Lease Agreement P2]. In addition to the 1987 Show, the parties agreed to additional Event dates in February of each year from 1988 through 2006. [Exhibit d–1, Rider ¶ 44.A.]. The Rosen Agency held Crafts Shows at the Convention Center pursuant to the Lease Agreement and Rider in 1987, 1988 and 1989.

On March 28, 1989, debtor Valley Forge Plaza Associates ("Valley Forge") filed for bankruptcy relief under Chapter 11 of the federal bankruptcy laws. On or about May 2, 1989, the debtor filed a Motion to Assume the Lease Agreement and Rider between the Convention Center and The Rosen Agency pursuant to section 365(a) of the Bankruptcy Code. The bankruptcy court granted this motion by Order dated June 7, 1989.

On May 18, 1989, The Rosen Agency canceled the 1990 Event at the Convention Center pursuant to paragraph 25 of the Lease Agreement and terminated the remainder of the Lease Agreement and Rider pursuant to paragraph 44.A of the Rider. [Exhibit P–9]. On or about July 27, 1989, Valley Forge filed the Complaint in the instant action alleging breach of contract against the Rosen Agency and defamation, intentional interference with contractual relations, injurious falsehood and "failure to communicate information accurately" against The Rosen Agency and Wendy Rosen. Valley Forge filed an Amended Complaint on August 30, 1989 adding a claim against The Rosen Agency for an outstanding account receivable. Defendants Wendy Rosen and The Rosen Agency filed an Answer on September 12, 1989.

On December 22, 1989, Defendants filed a Motion for Partial Summary Judgment on Counts II and VI of the Amended Complaint which alleged claims for breach of contract and "failure to communicate information accurately." By Order and Memorandum dated January 17, 1990, the bankruptcy court denied Defendants' motion.

Both parties submitted Trial Briefs on February 9, 1990 and a trial was held before the bankruptcy court on February 14 and 15, 1990. Valley Forge and Intervenor Plaintiff Official Committee of Unsecured Creditors filed Proposed Findings of Fact and Conclusions of Law and Post Trial Briefs on March 16, 1990. Defendants filed same on March 30, 1990.

On May 11, 1990, the bankruptcy court issued an Opinion and Order finding in favor of the Plaintiff on the claims for breach of contract, defamation, interference with contractual relations, and injurious falsehood (trade disparagement) and in favor of the Defendants on the claim for "failure to communicate information accu-

---

1. References to the testimony are given by date, page and line number. Accordingly, [2/14/90, 110:2–112:18] indicates that the testimony appears in the transcript of the February 14, 1990 trial day at page 110, line 2 through page 112, line 18. The two days of trial testimony were each transcribed in a single volume with each volume beginning with page 1.

rately." The bankruptcy court awarded damages to Valley Forge in the amount of $290,718.55 plus attorneys fees and costs for the breach of contract claim, $7,345.97 for an unpaid invoice, and a total of $3,000.00 in punitive damages on plaintiff's claims for defamation, interference with contractual relations, and trade disparagement. 113 B.R. 892.

The bankruptcy court's Order was conditional, however, in that it allowed Defendants to "mitigate" their damages "by notifying the Debtor and [the bankruptcy] court in writing on or before July 2, 1990, of their intent to hold either the 1991, 1992 or 1993 Event at the [debtor's] Facilities." In that such "mitigation" still required Defendants to pay liquidated damages for cancellation of the 1990 Event and debtor's attorneys' fees and costs, Defendants elected not to exercise this option which would, Defendants argue, effectively provide Valley Forge with a double recovery for an alleged single legal injury.

## II. *Factual Background.*

Sometime prior to October 2, 1986, The Rosen Agency began negotiations with plaintiff Valley Forge Plaza Associates ("Valley Forge"), trading as the Valley Forge Convention & Exhibit Center (the "Convention Center"), for use of its Convention Center. The Rosen Agency is in the business of organizing crafts shows around the country and was interested in using the Convention Center for a crafts show in early 1987. [2/14/90, 8:21–23]. Defendant Wendy Rosen is the President of the Rosen Agency. Wendy Rosen and Rita Linder ("Linder") negotiated with the Convention Center on behalf of The Rosen Agency, with Louis Paul ("Paul") and Howard Rosenthal ("Rosenthal") representing the Convention Center.

On or about August 21, 1986, Commerce Travel, a travel agency acting on behalf of The Rosen Agency, signed several documents, each entitled "Multiple Property Booking Report" (the "Booking Report"), which confirmed the availability of rooms in the Sheraton Valley Forge Hotel for use by participants and guests at the crafts shows. One of those Booking Reports was for the period of the 1990 Crafts Show. The reverse side of each Booking Report, including the 1990 Booking Report, provides that the rooms may be canceled without penalty at any time up to seventy-two hours before the commencement of the Event.

On October 2, 1986, The Rosen Agency and the Convention Center entered into a Lease Agreement (the "Lease Agreement") and Rider No. 1 to Lease Agreement (the "Rider") pursuant to which The Rosen Agency agreed to lease approximately 143,-384 square feet of space in the Convention Center for the purpose of producing an "Event." The Lease was further modified by a letter agreement (the "Letter Agreement") dated October 2, 1986, which was sent and signed by Louis Paul for the Convention Center to Wendy Rosen, who signed the Lease on behalf of the Rosen Agency.

The relevant provisions of the Lease Agreement and Rider are as follows:

1. The Lease Agreement defines "Event" as "an exhibition, show or display of crafts" known as the Buyers Market of American Crafts (the "Crafts Show"). Lease Agreement ¶ 3.

2. The term of the Lease is from 5:30 a.m. on February 4, 1987, through 3:00 p.m. on February 10, 1987. Lease Agreement ¶ 4.A.

3. The lease payment for the 1987 Event was $75,600. Lease Agreement ¶ 5.A.

4. Paragraph 44.A. of the Rider provides that in addition to the Event scheduled for February, 1987, the parties agreed to additional Event dates in February of each year for nineteen years, beginning in 1988 and ending in 2006. Rider ¶ 44.A.

5. Among the Events listed was an Event scheduled for the week of February 7, 1990. Rider ¶ 44.A.

6. Lease payments for the additional years were to be calculated in accordance with a formula set forth in the Rider. Rider ¶¶ 44.C.; 44.D; 44.E.

7. Paragraph 25 of the Lease Agreement provides that if The Rosen Agency ("Promoter") cancels any Event covered by the Lease Agreement, The Rosen Agency is liable to the Convention Center for liquidated damages. Lease Agreement ¶ 25.

8. Paragraph 25 of the Rider provides that any sums due under Paragraph 25 of the Lease shall be reduced dollar for dollar by amounts obtained in reletting the leased premises, less costs, expenses and damages incurred by the Convention Center as a result of The Rosen Agency's "cancellation of the Lease Agreement." Rider ¶ 25.

9. Paragraph 44.A. of the Rider provides that "Beginning with the EVENT scheduled in 1988 and thereafter, the CENTER or PROMOTER may terminate the LEASE AGREEMENT and this RIDER by notifying the other in writing a minimum of twelve months before the Commencement Date of the next scheduled EVENT." Rider ¶ 44.A.

The Rosen Agency held Crafts Shows at the Convention Center pursuant to the Lease Agreement and Rider in 1987, 1988 and 1989. The Convention Center had difficulty in meeting the express requirements of The Rosen Agency for both the 1988 and the 1989 Crafts Show including lapses in security, maintenance and personnel problems. [Exhibit D–21; 2/14/90, 285:13–23; 2/15/90, 76:17–18, 77:7–25, 78:22–79:5, 80:17–82:15, 83:10–14, 98:8–12].

The alleged inability of the Convention Center to provide services in a satisfactory manner during the 1989 Crafts Show caused Rosen Agency personnel to have concerns about the financial future of Valley Forge. In response to rumors about Valley Forge's financial difficulties, J. Leon Altemose ("Altemose") called an informal meeting on February 12, 1989, the last day of the 1989 Crafts Show. [2/15/90, 105:14–18]. At that meeting, Altemose denied that Valley Forge was experiencing any financial difficulties and represented that Valley Forge was not con-

templating filing a bankruptcy petition. [2/15/90, 101:22–24, 105:16–18, 107:7–108:2, 116:10–15]. Altemose also proposed at that meeting that The Rosen Agency consider entering into a binding five-year commitment to the Convention Center to replace what Valley Forge admits was a year-to-year arrangement under the Lease and Rider. [2/14/90, 275:10–25].

On March 28, 1989, Valley Forge filed for bankruptcy under Chapter 11 of the federal bankruptcy laws. [2/14/90, 131:9–11]. The petition filed by Valley Forge identified it as the owner of the Valley Forge Convention and Exhibit Center, the Sheraton Valley Forge Hotel, and the Radisson Hotel. This was The Rosen Agency's first actual notice that the Sheraton and Radisson Hotels were owned by the same entity as the Convention and Exhibit Center. [2/14/90, 68:21–69:11]. During their four year relationship, The Rosen Agency had always contracted separately with the various facilities and received separate invoices for their services. [2/14/90, 69:3–7: 2/15/90, 121:5–8].

Sometime later in the spring of 1989, Wendy Rosen, acting in her capacity as President of The Rosen Agency, sent a letter and "Exhibitor Survey" to the approximately 800 exhibitors who participated in the 1989 Crafts Show. [Exhibit P–8]. Rosen's letter and "survey", purportedly sent to advise the exhibitors of Valley Forge's bankruptcy filing, contained numerous alleged falsehoods, according to Valley Forge, regarding the impact of the bankruptcy and Valley Forge's ability to perform under the Lease. However, following Valley Forge's bankruptcy filing, neither Rosen, nor any Rosen Agency representative, ever contacted any representative of Valley Forge to determine the status of the bankruptcy proceedings or to inquire how, if at all, those proceedings would affect Valley Forge's ability to render the services required by and under the Lease. Although Rosen allegedly consulted with assorted "advisers," including attorneys on her "Boards," concerning the contents of her letter to exhibitors, they did not purport to investigate, confirm or even

review the factual validity of any of the alleged "facts" about Valley Forge. (Appellee's Brief, p. 12).

According to Valley Forge, Rosen's letter was erroneous and the survey was, by her own admission, "slanted." (Appellee's Brief, p. 13). Rosen's letter did not advise the exhibitors that each of the other promoters Rosen had contacted had decided to continue doing business at Valley Forge. Rather than asking exhibitors simply whether they would "participate" if the show remained at Valley Forge, Rosen's Survey asked whether the exhibitors "would rather take a risk and do Valley Forge." (Appellee's Brief, p. 13). By May 10, 1989, the Rosen Agency had received over 400 responses to the survey; seventy-six percent of the responding exhibitors who previously participated at Valley Forge, and used the hotels and related facilities, unsurprisingly expressed a desire not to "take a risk" and return to Valley Forge.

On or about May 11, 1989, Rosen telephoned Paul and demanded that she be "let out" of the Lease immediately and she intimated she would institute a law suit if she was not let out of the Lease (Appellee's Brief, p. 13). Rosen admitted that her reason for terminating the Lease immediately was to move the show to Atlantic City and make more profits (Appellee's Brief, p. 14). When Paul reminded Rosen that, under the terms of the Lease, the Rosen Agency was obligated to hold the 1990 EVENT at Valley Forge, Rosen threatened:

a. "[T]o bury [Valley Forge] in the trade";

b. "[T]o prove that [Valley Forge] had incompetent management"; and

c. To harm Valley Forge's reputation in the trade and "have all the trade press at the hearing at her expense...."

Appellee's Brief, p. 14.

A subsequent letter to Valley Forge dated May 18, 1989 by Rosen, acting on behalf of the Rosen Agency, purported to (1) cancel the 1990 EVENT; (2) terminate the Lease; and (3) cancel any and all booking agreements for hotel rooms at the Sheraton and Radisson. As threatened by Rosen, the 1990 EVENT was not held at Valley Forge. As a result of the termination of the Lease and refusal to hold the 1990 EVENT at Valley Forge, virtually none of the hotel rooms or other services at Valley Forge normally used by the exhibitors and attendees were occupied or used by such persons or otherwise. The net loss to Valley Forge due to the Rosen Agency's failure to hold its 1990 show at Valley Forge was at least $290,718.55 (Appellee's Brief, p. 15).

### III. *Standard of Review.*

In its role as an appellate court, this court's review of facts as found by the bankruptcy court is subject to the "clearly erroneous" standard. *See* Bankruptcy Rule 8013, *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81, 84 (3d Cir.1988). This Court's review of legal conclusions is subject to plenary review. *Id.* at 84.

### IV. *Discussion.*

A. The Bankruptcy Court's Imposition of Joint and Several Liability On Wendy Rosen On The Breach of Contract Claim Was A Clear Error of Law

■ After careful review, the court finds that the bankruptcy court's imposition of joint and several liability upon Wendy Rosen personally as well as upon The Rosen Agency for the $290,718.55 breach of contract damages and $7,345.97 in unpaid charges allegedly accrued under the contract from the 1989 Event was clearly erroneous. Wendy Rosen was not named as a defendant on the Breach of Contract or Account Receivable claims. *See* Amended Complaint, Counts II and VII.[2] Moreover,

---

**2.** Count I seeks injunctive relief against The Rosen Agency and Wendy Rosen for publication of allegedly false statements; Count II asserts a claim for breach of contract against *only* The Rosen Agency; Counts III, IV, V, and VI allege defamation, interference with contract and prospective economic disadvantage, injurious falsehood and "failure to communicate information

she was not even a party to the Lease Agreement at issue. [Exhibit D–1]. Nor was she a guarantor of The Rosen Agency's obligations under the Lease Agreement. The bankruptcy court failed to even address the issue of joint and several liability in its Opinion. Nevertheless, the bankruptcy court included this "novel conclusion" in its Order without providing any basis for imposing such liability on Wendy Rosen.

An individual who has not been sued on a contract cannot be held personally liable for breach of that contract. A court may not sua sponte impose liability on an individual against whom the plaintiff has chosen not to file a complaint. Wendy Rosen was not a defendant on the contract claim and was not even a party to the contract. A corporation is a legal fiction which can "act" only through its officers, directors and agents. *Daniel Adams Assocs., Inc. v. Rimbach Publishing, Inc.*, 360 Pa.Super. 72, 79, 519 A.2d 997, 1000 *alloc. den.* 517 Pa. 597, 535 A.2d 1056 (1987). Wendy Rosen signed the Lease Agreement in her capacity as President of The Rosen Agency. Pennsylvania law has long recognized that when a party contracts with a corporation through a corporate agent who acts within the scope of her authority and reveals her corporate principal, the corporate principal alone is liable for breach of the contract. *Revere Press, Inc. v. Blumberg*, 431 Pa. 370, 373, 246 A.2d 407 (1968). Moreover, there was no evidence whatsoever that Wendy Rosen was a guarantor or otherwise assumed the obligations of The Rosen Agency under the Lease Agreement. The court finds that there can be no doubt that The Rosen Agency alone is liable for any alleged breach of the Lease Agreement here. Accordingly, the court shall reverse and vacate that part of the bankruptcy court's Order holding Wendy Rosen personally liable for damages for breach of contract and accounts receivable under Counts II and VII of the Complaint.

accurately" respectively, against both defendants; and Count VII, a claim for an Account

### B. The Bankruptcy Court's Interpretation of the Lease Agreement

The bankruptcy court found that the "key to the resolution of the Debtor's breach of contract action against the Defendants is the interpretation of the Lease as it was executed." (113 B.R. at 898).

The Appellants contend that "paragraphs 25 and 44A are completely consistent and form complementary procedures for cancellation of an Event and termination of the Lease Agreement." (Appellants' Brief, p. 22). Appellants further contend that the bankruptcy court's determination that cancellation of the event scheduled to occur during the twelve-month notice period would negate the value of the notice period "completely ignores the plain language and obvious intended effect of the Lease Agreement." (*Id.*) Despite appellants protests on this issue, it is clear that the bankruptcy court went to great lengths to determine whether the Lease could be interpreted without resorting to extrinsic evidence. The bankruptcy court ultimately concluded that it was able to obtain "a consistent meaning of these paragraphs" only after "a review of the entire Lease and testimony of the parties." (113 B.R. at 901).

The fundamental objective of contract construction is a determination of the real intention of the parties. *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1131 (3d Cir.1969) (citing Williston, Interpretation and Construction of Contracts, Ch. 22, Section 619). It is the trial court's duty to discern the parties' mutual intent as reflected in the meaning of the contract language. In determining whether a contract is ambiguous, a trial court should look to "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir.1980). Applying the approach approved by the Third Circuit, the bankruptcy court rejected Ap-

Receivable, is against *only* the Rosen Agency.

pellants' contention that it was the intention of the parties, as expressed in the specific contract terms, to be able to separately cancel the next scheduled EVENT and also terminate the Lease. As the bankruptcy court noted:

> The testimony at trial established that, in the original draft of paragraph 44A, the right to terminate the Lease embodied therein belonged solely to the Agency. In the negotiation process, the Debtor obtained this right for itself as well. Further, both parties agreed that twelve months was an adequate length of time for each to make other arrangements upon the other's termination of the Lease. To conclude that the Event scheduled during those twelve months need not be held would negate any value of the twelve months' notice period.

> The Defendants appear to be arguing that they would be able to evade the effect of paragraph 44 by first canceling the 1990 Event, and then terminating the entire Lease, effective 1991. There are three reasons why this argument is unpersuasive. Firstly, as the Creditors' Committee, an intervening plaintiff, argues, paragraph 25 does not appear to be applicable to the circumstances under which the 1990 Event was simply moved from the Center to Atlantic City rather than canceled. Secondly, Rosen purported to both cancel the 1990 Event and terminate the Lease in the same letter. This made it perfectly clear that the cancellation of the 1990 Event was just one aspect of a complete cancellation of the Lease. Thirdly, even were the Defendants' attempt to avoid liability for violating the twelve months' notice requirement not so obvious as when the cancellation of an Event and termination of the Lease are collapsed in a single letter, it does not appear that any attempt to frustrate the twelve months' requirement should be tolerated.

113 B.R. at 901.

In reaching the above conclusion, the bankruptcy court held that the Lease, including Rider No. 1, constituted a single consolidated agreement and was intended by the parties to be interpreted in a unified and consistent manner. Appellants, in an attempt to escape liability for damages caused by their breach of the Lease, argue that the Rosen Agency may first terminate the Lease, then cancel any remaining EVENT, and pay only liquidated damages.

Of critical importance to Valley Forge during the extensive negotiations which culminated in the Lease was the need to cover its actual loss in the event of the termination of the Lease. Without a sufficient notice period, no meaningful effort to cover the losses could be made given Appellants' long-term lease, the withdrawal of space for rental during that time and the lead time necessary to obtain convention center tenants. Valley Forge and Rosen ultimately agreed that twelve months was the minimum amount of time necessary. It was the parties' intention and negotiated agreement that, in the event of the termination of the entire Lease, as here, any EVENT falling within the twelve-month notice period would be performed at Valley Forge's facilities. Having reached this agreement, Paragraph 44.A was incorporated into the Lease. At no time did the parties intend that this twelve-month minimum notice provision could be avoided in return for the limited liquidated damages set forth in Paragraph 25. I find that any logical, consistent and common-sense reading of the Lease makes clear that Paragraph 44.A nullifies any right to cancel any remaining EVENT within the notice period, including the 1990 EVENT.

It is clear in this case that The Rosen Agency breached the Lease Agreement. The analysis employed by the bankruptcy court was correct and shall be affirmed.

### C. The Bankruptcy Court's Calculation of Damages

■ The Appellants contend that the bankruptcy court erred in its award of damages, claiming that "The Rosen Agency can not [sic] be liable to the hotels or restaurants also owned by Valley Forge Plaza Associates because they were neither parties to the Lease Agreement nor intended beneficiaries thereunder." (Appellants' Brief, pp. 30–31).

Because Valley Forge's facilities constitute an integrated project there is a natural relationship between usage of the convention center and the use of the hotels, restaurants, night clubs, bars and banquet facilities. Thus, as a result of the Appellants' breach, Valley Forge naturally suffered a loss of revenues in the convention center and each of those facilities. (113 B.R. at 903). The court finds that there is no question but that such losses naturally and ordinarily resulted from the breach, especially in light of Valley Forge's ability to look to the historical data compiled from prior periods when Appellants' shows were held at the facilities. Furthermore, the bankruptcy court specifically concluded that Appellants were well aware that they had contracted for the use of a unified, integrated facility, and not just the Convention Center. As such the potential liability for profits of the entire facility in the event of a breach of the Lease was reasonably foreseeable by Appellants at the time the Lease was executed despite their vehement contentions to the contrary. (Appellee's Brief, p. 30).

The law is clear that where a contract is breached without legal justification the injured party is entitled to recover whatever damages he suffered provided:

"(1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty." *Taylor v. Kaufhold*, 368 Pa. 538, 546, 84 A.2d 347, 351 (1951).

In the immediate case, I find that the bankruptcy court properly held that Valley Forge proved both natural flow of damages and foreseeability; the bankruptcy court's conclusions are not clearly erroneous despite Appellants attempts to so characterize them. As the determination by the bankruptcy court as to the proper amount of damages is not clearly erroneous and does not "offend fundamental conceptions of allowable damages," the award shall be affirmed. *Bruce Lincoln–Mercury, Inc. v. Universal C.I.T. Credit Corp.*, 325 F.2d 2, 21 (3d Cir.1963).

### D. The Bankruptcy Court's Holding On Plaintiff's Claims Based On Defendant's Communications To Third Parties

Following Valley Forge's Chapter 11 filing, Valley Forge contends that defendant Rosen deliberately and maliciously engaged in a campaign of defamation, misrepresentation and falsehoods. Valley Forge argues that the Appellants intentionally delivered the purported "Survey" to over 800 exhibitors and others, many of whom had had prior contractual relationships with Valley Forge and/or intended to enter into contracts with it in connection with the 1990 EVENT. Valley Forge maintains that the letter and "Survey", by their own terms, included the publication of knowingly false statements or, at least, statements which were recklessly made and in breach of Appellants' duty to determine the truth or falsity of the stated facts being communicated, the sole purpose of which was to mislead the exhibitors, encourage them to cease any business relationship with Valley Forge and harm Valley Forge. (Appellee's Brief, p. 34). The bankruptcy court concluded that "Rosen's conduct in publishing falsehoods in the Survey was outrageous and, clearly, her intent was to injure" Valley Forge as these statements "were intentionally made to defame the Debtor and, at best, were made with reckless disregard and indifference as to their truth and effect on the Debtor." (113 B.R. at 904).

### 1. The Defamation Count (Count III).

As noted by the bankruptcy court, Pennsylvania has adopted Section 559 of the *Restatement of Torts* (1938) as "the test for defamatory meaning." To be defamatory, it is not necessary to prove that the statement actually caused harm to another's reputation:

" 'A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.' " *Agency Services, Inc. v. Reiter*, 513

F.Supp. 586, 587 (E.D.Pa.1981). *See also* 42 Pa.C.S.A. § 8343(a).

In determining whether a particular statement is defamatory, "a court must weigh both the language of the communication, and the context in which the communication is made." *Id.* at 587–88; *see also Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 502 (3d Cir.), *cert. denied*, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978). Further, in *Beckman v. Dunn*, 276 Pa.Super. 527, 419 A.2d 583, 586 (1980), the court held:

> " 'The test is the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.' "

In this case, the court finds that the misstatements contained in Appellants' communications, as well as the context in which they were made, may properly have been found by the bankruptcy court to be defamatory. As noted by the bankruptcy court:

> "The circumstances surrounding the Survey clearly evidence the Defendants' intent to defame and injure the Debtor. When he refused to accede to [Rosen's] demand to agree to terminate the Lease, Paul testified, without rebuttal, that Rosen told him that she was going to 'bury' the Debtor and speak to journalists and other show managers regarding her 'concerns' about the Debtor. Thus, the statements in the Survey appear to be just one aspect of a series of acts intended to defame and injure the Debtor." (113 B.R. at 906).

Moreover, Appellants misstate the bankruptcy court's Opinion concerning the existence of a conditional privilege. In fact, the bankruptcy court rejected that claim because Appellants' conduct and defamatory statements were neither "from a proper motive" nor "based upon reasonable cause," and not simply because of the lack of any recognized public interest. *See Beckman v. Dunn, supra,* at 587–88. Instead, the bankruptcy court found as a fact that:

> "The Defendants' motive was to injure the Debtor. We find that the statements were not based upon reasonable cause, as we have concluded that they were made with malicious intent and without care as to their truth." (113 B.R. at 907).

After careful review, this court is compelled to conclude that there is more than a sufficient basis upon which to find that the bankruptcy court's decision was correct with respect to Valley Forge's defamation claim. Accordingly, the bankruptcy court's decision in favor of Valley Forge in the amount of $1,000.00 in punitive damages as against Wendy Rosen, named as a defendant on this tort count (Count III), and the Rosen Agency, jointly and severally, shall be affirmed.

The court finds, however, that the bankruptcy court clearly did not intend to, and did not, award Valley Forge any compensatory damages on this, or the remaining, tort claims. As the bankruptcy court Opinion clearly shows, the bankruptcy court did not award any compensatory damages on the tort claims because Valley Forge failed to prove its tort damages with the requisite certainty. In refusing to award compensatory damages on any of Valley Forge's tort claims, the bankruptcy court properly applied the well-established principle that a plaintiff has the burden of proving the amount of its damages to a reasonable degree of certainty. *See American Air Filter Co. v. McNichol*, 527 F.2d 1297, 1301 (3d Cir.1975).

In a desperate attempt to keep Wendy Rosen personally liable for the entire amount of the judgment, Valley Forge has manufactured a fanciful, and completely implausible, argument that is simply not supported by the bankruptcy court's Opinion. In its brief, Valley Forge argues that:

> [t]he Bankruptcy Court held that (1) the Rosen Agency was liable to Valley Forge for $290,718.55 in damages for breach of the Lease and (2) both Appellants were liable to Valley Forge for tort damages as "[t]he defamatory statements ... contributed to the damages of the Lease."

(Appellee's Brief, p. 17). Valley Forge thus argues that the bankruptcy court

found that both Wendy Rosen and The Rosen Agency should be jointly and severally liable for the entire damages award on both the contract and tort claims. *Id.* Valley Forge's conclusion is absolutely inconsistent with the unambiguous language of the bankruptcy court's Opinion.

In its Opinion, the bankruptcy court clearly did not award Valley Forge any compensatory damages on any of the tort claims. As to Valley Forge's defamation claim, the bankruptcy court stated its holding succinctly:

We will, however, limit the damages awarded to the Debtor for defamation. The Debtor did not quantify its compensatory damages with respect to its defamation action and it is not our place to estimate such damages. We will, therefore, make no award to the Debtor on account of these damages.

(113 B.R. at 908). Clearly, the bankruptcy court awarded no compensatory damages on Valley Forge's defamation claim because Valley Forge failed to meet its burden of proof, not because damages for defamation were already awarded as part of the $290,418.55 in damages for breach of contract.

Similarly, the bankruptcy court declined to award any compensatory damages on the interference with contract claim. The bankruptcy court clearly stated that "as in the case of its claim for defamation, the Debtor has not specially quantified the amount of these damages. Therefore, we will not award the Debtor any compensatory damages on this cause of action." (Bankr.Op. at 43).

Finally, the bankruptcy court held that Valley Forge also failed to meet its burden of proving damages on its trade disparagement claim. In declining to award any compensatory damages, the bankruptcy court held that "[f]or the same reasons articulated [in the defamation discussion], ... an award of punitive damages to the Debtor on this claim is also limited to $1,000.00" (113 B.R. at 911–12).

This court finds that the bankruptcy court's Opinion clearly demonstrates that it did not award any compensatory damages

on the tort claims because Valley Forge failed to prove its tort damages with the requisite certainty.

As Appellants correctly point out, Valley Forge, attempting to shoehorn the bankruptcy court's opinion into its tortuous analysis, repeatedly misstates the bankruptcy court's decision regarding the imposition of joint and several liability. For example, in discussing the damages awarded for defamation, Valley Forge argues that "[s]ince the amounts awarded under either the contract or tort theory are equal, the Bankruptcy Court properly held Appellants jointly and severally liable." (Appellee's Brief at 42). Valley Forge's argument is simply unsupported by any language in the Opinion. The bankruptcy court's Opinion specifically states that no compensatory damages would be awarded for defamation because Valley Forge had failed to quantify any compensable loss as a result of any alleged misstatements by Wendy Rosen (113 B.R. at 908–09, 910–11). Nowhere does the bankruptcy court suggest, as Valley Forge argues, that it was merely refusing to award tort damages in excess of the $290,718.55 already awarded on the contract claims. Instead, because Valley Forge gave the court no reasonable factual basis for calculating its alleged tort damages, the bankruptcy court awarded it no compensatory damages on the tort claims.

Moreover, the bankruptcy court's award of punitive damages to Valley Forge of $1,000.00 for each of the three tort claims was clearly in place of, and not in addition to, an award of compensatory damages. Indeed, the bankruptcy court discussed at length the fact the Pennsylvania law permitted an award of punitive damages in the absence of any compensatory damage award. *See* Bankr.Op. at 38–40. This discussion by the bankruptcy court would have been not only entirely superfluous but also illogical if the bankruptcy court was awarding Valley Forge compensatory damages on Valley Forge's tort claims. The bankruptcy court concluded that under Pennsylvania law "even though compensatory damages [are] not awarded, punitive

damages [are] permissible because a cause of action in defamation was proven." (113 B.R. at 909).

In sum, there is simply no legal basis for holding Wendy Rosen personally liable for damages for breach of contract and account receivable under Counts II and VII of the Complaint since she was never named as a defendant on these counts of Valley Forge's Complaint. Accordingly, the only liability that the bankruptcy court could properly have held Wendy Rosen accountable for, and that this court may properly affirm, must be limited to the $3,000.00 in punitive damages the bankruptcy court awarded Valley Forge on the tort claims to which Wendy Rosen was a named defendant.

### 2. The Interference With Contractual Relations Count (Count IV).

The tort of interference with present or future prospective contractual relationships or economic advantage is well-recognized in Pennsylvania. *See, e.g., U.S. Healthcare Inc. v. Blue Cross Of Greater Philadelphia,* 898 F.2d 914, 924–95 (3d Cir.1990); *Glenn v. Point Park College,* 441 Pa. 474, 272 A.2d 895 (1971). As articulated by the Superior Court, "the tort ... is an intentional one: the actor is acting as he does *for the purpose of causing harm* to the plaintiff," and " '[t]he wrong ordinarily requires conduct intended to interrupt negotiations or prevent the consummation of a contract.' " *Glenn,* 272 A.2d at 899 (emphasis in original).

In *Sachs v. Continental Oil Co.,* 454 F.Supp. 614, 620 (E.D.Pa.1978), this court stated the elements of tortious interference with prospective business or contractual relations as follows:

"The elements of this tort are (1) the actor (defendant) must act for the purpose of causing a specific type of harm to the plaintiff, (2) such action must be unprivileged, and (3) the harm must actually result. [Citations omitted.] Underlying these requisites is the existence of a contract or prospective contractual relation between the third party and the plaintiff. Moreover, the tort is an inten-

tional one. The defendant or actor must act for the purpose of causing harm to the plaintiff."

*See also Adler, Barish, Daniels, Levin & Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175, 1181–82, *cert. denied,* 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979) (adopting Restatement of Torts, § 766).

In this case, there exists sufficient evidence on the record to find that (1) Appellants' statements to the promoters, exhibitors and others were intentional and (2) they were made for the specific purpose of causing promoters, exhibitors and others to cancel their existing contractual relations with Valley Forge and to refuse to engage in any future such contracts. But for Appellants' intentional and wrongful acts, Valley Forge maintains that it would undeniably have continued to do business with Appellants, which had an existing contract with Valley Forge, as well as those exhibitors that were the targets of Appellants' communications and purported "Survey."

■ The bankruptcy court found "that the Debtor was able to establish that the [Appellants] tortiously interfered with prospective contractual relations", and further noted that:

"Experience from the 1986–1989 Events conclusively demonstrates that the Debtor had more than the requisite 'reasonable probability' that contractual relations would be realized with exhibitors and attendees for the rental of rooms in the Hotels and Facilities to hold individual meetings separate from the Event."

(113 B.R. at 910).

Moreover, the bankruptcy court acknowledged that "[t]he Debtor's damages as a result of the [Appellants'] interference with its prospective contractual relations are in the form of lost revenues from these contracts." (113 B.R. at 910).

In sum, this court finds that there is a sufficient basis here to affirm the bankruptcy court's award of $1,000.00 in punitive damages on Valley Forge's claim for intentional interference with contractual relations as against Wendy Rosen and the Rosen Agency jointly and severally. For

the reasons discussed above under Section D.1, at pages 799–800, of this Memorandum Opinion, the court's affirmance is strictly limited to the bankruptcy court's award of $1,000.00 in punitive damages on this tort count, as against Wendy Rosen and The Rosen Agency, and does not extend further.

### 3. The Publication of Injurious Falsehood Count (Count V).

The court finds that, as with the above counts sounding in tort discussed above, there was a sufficient basis on the record and under the applicable law in this case for the bankruptcy court to award punitive damages jointly and severally against the named defendants, Wendy Rosen and The Rosen Agency, in the amount of $1,000.00 on this count of Valley Forge's Complaint; accordingly, the court shall affirm the bankruptcy court's decision to award punitive damages. Again, for the reasons discussed above under Section D.1 of this memorandum opinion, however, this affirmance is limited strictly to the $1,000.00 in punitive damages awarded under Count V of the Complaint and is not to be read as including any compensatory damages for this count.

### 4. The Failure To Communicate Accurate Information Count (Count VI).

Valley Forge has filed a cross-appeal with regard to Count VI of the Amended Complaint alleging "failure to communicate information accurately." After careful review, I find that the bankruptcy court properly held that because Valley Forge neither relied on any alleged misstatements by Appellants nor was it a member of the class of entities which Appellants knew or should have known would rely on these statements, Valley Forge failed to state a claim on this theory. Accordingly, I shall affirm the bankruptcy court's decision on this count.

An appropriate Order follows.

### ORDER

AND NOW, this 9th day of October, 1990, after consideration of the Appeal of Defendants The Rosen Agency, Inc. and Wendy Rosen from the decision of the bankruptcy court, and the response thereto of Valley Forge Plaza Associates, and consistent with the foregoing Memorandum Opinion, it is hereby Ordered that the bankruptcy court's decision is REVERSED IN PART AND AFFIRMED IN PART as follows:

1. The bankruptcy court's Order imposing joint and several liability upon Wendy Rosen and The Rosen Agency for compensatory damages in the amount of $290,718.55 is REVERSED ONLY INSOFAR as it imposes personal liability for compensatory damages on Wendy Rosen. Accordingly, the bankruptcy court's Order imposing personal liability on Wendy Rosen under Counts II and VII of the Complaint in the amount of $290,718.55 plus attorneys fees and costs, and $7,345.97 for an unpaid invoice, is hereby VACATED.

2. The bankruptcy court's Order in favor of Valley Forge Plaza Associates and as against The Rosen Agency on Counts II and VII (the breach of contract and account receivable claims) of the Complaint for the compensatory damages in the amount of $290,718.55 plus attorneys fees and costs, and $7,345.97 for an unpaid invoice, is AFFIRMED.

3. The bankruptcy court's Order in favor of Valley Forge Plaza Associates and against Wendy Rosen and The Rosen Agency, jointly and severally, for punitive damages in the amount of $3,000.00 on Counts III, IV, and V (the tort claims) of the Complaint is AFFIRMED.

4. The bankruptcy court's Order in favor of Wendy Rosen and The Rosen Agency and against Valley Forge Plaza Associates on Count VI (the tort claim sounding in "failure to communicate information accurately") of the Complaint is AFFIRMED.

AND IT IS SO ORDERED.